Paul D. SABEL, et al., Plaintiffs,

v.

MEAD JOHNSON & CO., Defendant.

Civ. A. No. 84-3753-WF.

United States District Court,
D. Massachusetts.

May 14, 1990.

See also, 112 F.R.D. 211.

Robert Casey, Neil Sugarman, Sugarman and Sugarman, Boston, Mass., for plaintiffs.

Joseph L. Kociubes, John Finbury, Bingham, Dana & Gould, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiffs have brought this action against defendant Mead Johnson & Co., a pharmaceutical manufacturer, alleging that on October 10, 1983 its antidepressant medication Desyrel caused Paul Sabel to develop a priapism, a prolonged, painful erection, which ultimately required surgery and left him impotent. They seek to recover on theories of negligence and breach of warranty concerning the warnings for Desyrel.

Plaintiffs seek to introduce three pieces of evidence at trial over defendant's objections. These items are: 1) the tape and transcript of a March 21, 1983 meeting sponsored by defendant in Tucson, Arizona (the "Tucson tape"); 2) an April, 1984 letter written to defendant by Dr. Paul Leber, the director of the Food and Drug Administration's (the "FDA") Division of Neuropharmacological Drug Products (the "Leber letter"); and 3) notes of two June, 1983 telephone conversations with Richard Yeager, an employee in defendant's Regulatory Affairs department, made by Mr. Barash, an FDA employee (the "Barash notes"). For the reasons stated below, the court finds: 1) that the Tucson tape, with the exception of statements made by full-time Mead Johnson employees, constitutes inadmissible hearsay; 2) that the Leber letter is a public record admissible under Federal Rule of Evidence ("F.R.Ev.") 803(8)(C); and 3) that the Barash notes are inadmissible hearsay, not encompassed by F.R.Ev. 803(8).

## I. *The Tucson Tape*

The Tucson meeting was convened by Mead Johnson on March 21, 1983 to explore several aspects of the unexpected, but increasingly apparent association of Desyrel with priapism. The meeting was attended by five outside medical experts invited by Mead Johnson, as well as two employees of its Pharmaceutical Medical Services department. The meeting was chaired by Dr. Rubin Bressler, one of the outside experts, who had performed research sponsored by defendant in the past. One of the ten questions suggested for discussion at the meeting was "What should we tell the prescribing physician?" In general, topics discussed at the meeting included the potential pharmacological mechanisms by which Desyrel could cause priapism, possible avenues of research into the association of Desyrel with priapism, and what warnings to physicians should appropriately accompany Desyrel.

As a threshold matter, the court rejects defendant's contention that the tape and transcript of the Tucson meeting are irrelevant. The thoughts of the invited experts on the content of appropriate warnings reflects on the adequacy of defendant's warnings prior to plaintiff's injury. In addition, these discussions are relevant to the related point of the information which Mead Johnson had concerning the adequacy of their warnings and, thus, to the reasonableness of their conduct during the relevant period. Defendant's assertions that the outside consultants were not experts on labeling, and that they formed their opinions on the basis of incomplete

information and analysis, affects the weight and not the relevance of the proffered evidence.

■ Plaintiffs seek to introduce the tape and transcript as an admission of Mead Johnson under F.R.Ev. 801(d)(2), which provides, in pertinent part, that an out-of-court statement is not hearsay if "[t]he statement is offered against a party and is ... (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Admissibility under these two provisions is governed not by the trustworthiness of the statement, but by the existence and scope of the principal-agent relationship as determined under the common law of agency. 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(C)[01], at 801–210, ¶ 801(d)(2)(D)[01], at 801–221 (1987). Plaintiffs have not carried their burden of demonstrating the existence of an agency relationship between defendant and the outside invitees. Thus, invitees' statements at the Tucson meeting are hearsay.

■ An agency relationship has three essential characteristics: 1) the power of the agent to alter the legal relationships between the principal and third parties and the principal and himself; 2) the existence of a fiduciary relationship toward the principal with respect to matters within the scope of the agency; and 3) the right of the principal to control the agent's conduct with respect to matters within the scope of the agency. Restatement (Second) of Agency §§ 12–14 (1958). The courts have looked primarily at the issue of control in determining whether an agency relationship exists. *See United States v. Paxson,* 861 F.2d 730, 734 (D.C.Cir.1988) (admitting statement of corporate employee against corporate superior under Rule 801(d)(2)(D) where employee reported directly to superior); *United States v. Young,* 736 F.2d 565,

568 (10th Cir.1983) (same); *United States v. Mandel,* 591 F.2d 1347, 1368 (4th Cir. 1979) (in criminal prosecution of governor, Rule 801(d)(2)(D) covered statements of governor's legislative aides, but not of state senators); *see also North American Van Lines, Inc. v. NLRB,* 869 F.2d 596, 599 (D.C.Cir.1989) (right to control means and manner of performance the central inquiry in determining agency status for purposes of defining NLRB jurisdiction); *Allbritton Communications Co. v. NLRB,* 766 F.2d 812, 818 (3rd Cir.1985) (same), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986); *Afonso v. City of Boston,* 587 F.Supp. 1342, 1347 (D.Mass. 1984) (liability to direction and control the essential element in existence of master-servant relationship). Payment for services is relevant only to the extent that it bears on the issue of control. *Afonso,* 587 F.Supp. at 1347. Similarly, consent to control and to act in a fiduciary manner is important to a finding of an agency relationship. *See Abatti v. C.I.R.,* 644 F.2d 1385, 1390 (9th Cir.1981) (admitting binders prepared by defendant's accountant where accounting arrangements delegated to him); *United States v. Summers,* 598 F.2d 450, 459 (5th Cir.1979) (excluding taped statements of defendant's former agent on grounds that he could not be agent of defendant and informant for FBI at same time); *see also Johnson v. Bechtel Associates Professional Corp.,* 717 F.2d 574 (D.C. Cir.1983) (interpreting meaning of "agent" in context of indemnification statute), *rev'd on other grounds sub nom. Washington Metro. Area Transit Auth. v. Johnson,* 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984).

■ In the present case, it does not appear that Mead Johnson controlled the manner or means of discussion and analysis employed by the participants at the Tucson meeting. To the contrary, the tape and transcript of the meeting indicate it was a free-wheeling exchange of ideas, loosely moderated by one of the outside consultants.[1] It is not apparent who devel-

---

1. Although Dr. Bressler had apparently conducted research sponsored by Mead Johnson previ- ous to the meeting, no evidence has been presented that he was an employee of Mead

oped the agenda for the meeting. Although Mead Johnson financed the meeting and provided the factual information underlying the bulk of the discussion, there is no evidence in the transcript or otherwise that its employees sought to foreclose avenues of inquiry or to prevent the expression of potentially damaging ideas.

In addition to Mead Johnson's apparent lack of control, there is no evidence that the consultants were empowered to speak or act on Mead Johnson's behalf. *See Ellis v. Kneifl,* 834 F.2d 128, 131 (8th Cir.1987) (statements of clerk of state court not admissible in suit against state court judge because clerk not authorized to act on judge's behalf). Mead Johnson never expressed an intent to be bound by the recommendations of the outside experts, nor did it even authorize or request them to prepare a written report on their findings and recommendations. The diversity of opinions expressed at the meeting, and the lack of resolution of differences among the experts, supports defendant's characterization of the meeting as a "brainstorming session," intended to generate ideas for defendant's further consideration, but not meant to establish its official position in any way.

F.R.Ev. 801(d)(2)(D) expanded the traditional admissions exception to the hearsay rule to include statements made by agents on matters within the scope of their agency, on the theory that an agent authorized to act on a principal's behalf is impliedly authorized to speak on the same matters. J. Weinstein & M. Berger, *supra,* at ¶ 801(d)(2)(D)[01]. Here, however, plaintiffs have not shown that the consultants possessed the power to act on defendant's behalf in any respect, much less that they enjoyed the specific "speaking authority" contemplated by F.R.Ev. 801(d)(2)(C). Where defendant did not control the participants in the discussion, where the participants lacked the power to legally bind defendant through their statements and ac-

tions, and where the participants did not enter into a fiduciary relationship with defendant, the factors which support attribution of an agent's statements to her principal are completely missing. Mead Johnson could not control the actions or statements of the participants in the Tucson meeting; nor would it have had reason to do so, given the unforeseeability that the statements of those individuals would be attributed to it in a court of law.

The cases cited by plaintiffs in support of admission are distinguishable. In *Reid Brothers Logging Co. v. Ketchikan Pulp Co.,* 699 F.2d 1292, 1306 (9th Cir.), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 280, 78 L.Ed.2d 259 (1983), the court held that a report prepared by an employee of defendant's corporate parent on defendant's business operations was admissible under F.R.Ev. 801(d)(2)(C) as an admission of defendant. The author of the report was given full access to defendant's records and was aided by defendant's employees, and defendant circulated the report to its directors, officers and managers. Under such circumstances, the court concluded, the employee was authorized by defendant to make statements regarding its business operations and the defendant adopted these statements by adopting his report. Here, by contrast, Mead Johnson controlled the information given to the outside consultants, did not request or receive a final report from them, and did not adopt as its own the ideas expressed during the meeting. Moreover, the statements made by the experts were off-the-cuff, rather than opinions carefully formulated after thorough investigation and analysis. *Collins v. Wayne Corp.,* 621 F.2d 777 (5th Cir.1980), is distinguishable from the present case on essentially the same grounds. *Id.* at 780–82 (report of expert hired by defendant to investigate and analyze bus accident admissible under F.R.Ev. 801(d)(2)(C) because expert was a "speaking agent" of defendant).[2]

---

Johnson or that Mead Johnson controlled or influenced his research beyond the mere fact of sponsorship.

2. *Union Mutual Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1, 7 (1st Cir.1986), also cited by plaintiffs, stands solely for the proposition that statements by a non-managerial employee are encompassed by F.R.Ev. 801(d)(2)(D) when made

Although the Tucson tape is not rendered non-hearsay by F.R.Ev. 801(d)(2), it could possibly be admitted for non-hearsay purposes. For example, the tape could demonstrate that Mead Johnson knew as of March, 1983 that several scientific experts thought its existing warnings were inadequate. A second, but related, purpose would be to show the context within which defendant took its subsequent remedial actions, such as the formation of a Desyrel task force and the preparation of a May, 1983 letter to doctors addressing, among other things, the risk of priapism. Overwhelming these relevant and probative purposes, however, are the dangers of unfair prejudice and confusion which introduction of the tape would entail.

First, as defendant points out, the outside participants in the Tucson meeting had not engaged in extensive analysis or thought on the problem of priapism in general or the adequacy of defendant's warnings in particular. The consultants first learned much of the data underlying their expressed views on the day of the conference. They also frequently took positions merely for the sake of provoking discussion. The tape indicates that several seemingly damaging statements about the company were made in jest. Much irrelevant discussion occurred concerning other drugs, other companies, other side effects, and other medical problems.

In addition, the qualifications of the speakers, and thus the weight to be given their opinions, cannot be accurately assessed. Their expertise on the issue of warnings cannot be determined from the evidentiary record, nor can such basic facts as whether they are treating physicians or solely clinical researchers. Indeed, most statements on the tape cannot be accurately attributed to a particular speaker. Under these circumstances, there is a significant danger that the jury would give the expressed opinions far greater weight than they deserve.

The court also has serious doubts whether, because of the close relationship be-

tween the possible non-hearsay and hearsay purposes of the tape (i.e.—defendant's knowledge of the experts' opinions on the adequacy of the warnings versus the adequacy of the warnings themselves), it could fashion an appropriate and effective limiting instruction.

The plaintiffs have offered considerable other evidence on the inadequacy of the warning for Desyrel in the relevant period, as well as on the non-hearsay purposes for which the tape of the Tucson meeting is offered. In these circumstances, the probative value of the tape for non-hearsay purposes is substantially outweighed by the risk of confusion and unfair prejudice. Thus, F.R.Ev. 403 precludes admission of the tape for the previously described non-hearsay purposes. *Cf. City of New York v. Pullman Inc.*, 662 F.2d 910, 915 (2nd Cir.1981) (excluding interim government report under Rule 403 where "as a so-called government report which in fact was incomplete and based largely on hearsay, the report would have been presented to the jury in 'an aura of special reliability and trustworthiness' which would not have been commensurate with its actual reliability"), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).

## II. *The Leber Letter*

Plaintiffs seek to introduce an April, 1984 letter from Dr. Paul Leber, Director of the FDA's Division of Neuropharmacological Drug Products, recommending that a boxed warning be included in Desyrel's label to emphasize the risk of priapism and the potential need for surgery and threat of impotence. Defendant objects on relevance and hearsay grounds.

On its face the letter appears to rely solely on information that was available prior to plaintiff's priapism. More specifically, it expressly refers to the pre–October 10, 1983 adverse reactions reported in an October, 1983 *American Journal of Psychiatry* article authored by Dr. Maryonda Scher and summarized in the March 30,

on matters within the scope of his agency. It does not render admissible statements made by

outside consultants solely for the purpose of idea-generation.

1984 issue of *The Medical Letter*.[3] The letter opens with the statement, "We note that priapism continues to be reported as an adverse reaction associated with the use of Trazodone." This statement does not necessarily imply that Leber was aware of cases of priapism occurring after plaintiff's injury, particularly since the remainder of the paragraph and letter refer only to the Scher and *The Medical Letter* articles. Significantly, the letter concludes, "It is our opinion that adverse experiences summarized in the above articles alter the balance between the relative risks and benefits of this drug for men, and we believe that further labeling revisions are now warranted." This statement indicates to the court that Dr. Leber relied solely on the cases reported in the published literature in determining that labeling changes were, in his view, necessary; thus, even if Dr. Leber did know of plaintiff's injury or of later priapisms associated with Desyrel, this information was evidently not material to his conclusions regarding Desyrel's labeling.

■ The court is satisfied that the recommendations contained in the Leber letter were based on adverse reaction reports known to Mead Johnson prior to the time of Dr. Sabel's injury. The letter is, therefore, highly relevant to whether Mead Johnson's warnings were adequate prior to that date.[4] *See Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1084–85 (5th Cir.1986) (post-injury documents admissible where reflect pre-accident knowledge and experience). Nor is its admission barred by F.R.Ev. 407, because it is not a post-injury remedial measure undertaken by de-

fendant, but rather one suggested by a third-party governmental agency.

■ The court further concludes that the letter is excepted from the hearsay bar because it qualifies as a public record under F.R.Ev. 803(8)(C). Rule 803(8)(C) excludes from operation of the hearsay bar "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The exception rests on "the assumption that a public official will perform his duty properly," without bias or improper motivation. *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir.1983) (quoting Notes of Advisory Committee on Proposed Rule F.R.Ev. 803(8)); *United States v. Versaint*, 849 F.2d 827, 832 (3rd Cir.1988). The burden is on the party opposing admission to demonstrate the statement's untrustworthiness. *Kehm*, 724 F.2d at 618.

The Supreme Court made clear in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 446, 102 L.Ed.2d 445 (1988), that "factually based conclusions or opinions are not on that account excluded from the scope of Rule 803(8)(C)." This includes opinions on the ultimate factual issues in a lawsuit. *Id.* 109 S.Ct. at 450 (admitting Navy investigative report of air crash which opined that pilot error was most likely cause of crash); *Litton Systems*,

---

3. The March 30, 1984 issue of *The Medical Letter* reports nine cases of priapism and three cases of prolonged erection, of which four, including the case featured in the Scher article, required surgery. While it is not clear when the reported cases occurred, these numbers and the details given on the cases are consistent with the incidents reported to Mead Johnson prior to October, 1983. The court finds support for this conclusion from the March 28, 1984 Mead Johnson Product Newsletter, which states that *The Medical Letter* "presents no new data," but "summarizes information that previously has appeared elsewhere in the literature." This reference can only be to the Scher article, which Mead Johnson also represented to report no new data in its November 2, 1983 Product

Newsletter. Thus, in relying on *The Medical Letter*, Dr. Leber was not taking into account data unknown at the time of Dr. Sabel's priapism.

4. The letter is not, however, relevant to the issue of whether Desyrel was a cause-in-fact of plaintiff's priapism. There is no pharmacological, statistical or other data in the letter addressed to the issue of causation, nor does Dr. Leber purport to reach any conclusions in this regard. Thus, just as the adverse reaction reports were previously admitted on the issues of notice and adequacy of warning, but not on the issue of causation, a comparable limiting instruction is necessary concerning Dr. Leber's letter.

*Inc. v. A.T. & T.,* 700 F.2d 785, 818 (2nd Cir.1983) (admitting FCC decisions that defendant's tariffs were "unreasonable" and "discriminatory"), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). In so holding, the Supreme Court stated:

> A broad approach to admissibility under Rule 803(8)(C), as we have outlined it, is also consistent with the Federal Rules' general approach of relaxing the traditional barriers to "opinion" testimony. Rules 702–705 permit experts to testify in the form of an opinion, and without any exclusion of opinions on "ultimate issues." And Rule 701 permits even a lay witness to testify in the form of opinions or inferences drawn from her observations when testimony in that form will be helpful to the trier of fact. We see no reason to strain to reach an interpretation of Rule 803(8)(C) that is contrary to the liberal thrust of the Federal Rules.

*Beech Aircraft,* 109 S.Ct. at 450. The Court concluded that as long as the public report contains factual findings and satisfies Rule 803(8)(C)'s trustworthiness requirement, the opinions and conclusions incorporated therein should be admitted over a hearsay exception. *Id.*

The Supreme Court also cited approvingly, in footnote 11 of its opinion, the non-exclusive list of four factors proposed by the Advisory Committee for determination of trustworthiness under the Rule: "(1) the timeliness of the investigation; (2) the investigator's skill or expertise; (3) whether a hearing was held; (4) possible bias when reports are prepared with a view to possible litigation." *Id.* at 449 n. 11. These factors have consistently been used by the courts in applying F.R.Ev. 803(8)(C) to proposed evidence.

The court finds that the Leber letter satisfies both prongs of Rule 803(8)(C) and is, therefore, admissible almost in its entirety. With regard to the first prong, Dr. Leber's opinion is based on a factual investigation of the association between Desyrel

and priapism. It makes no difference that the underlying data was collected by and received from an outside party, as long as the information was reliable. *See Robbins v. Whelan,* 653 F.2d 47, 51 (1st Cir.) (automotive safety data collected by manufacturers and submitted to Department of Transportation), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981). Here, the information was derived from an article in a peer-reviewed medical journal, which in turn relied on data obtained from defendant itself. Further, the recommendation in the letter regarding surgery and impotence is expressed as a final opinion of the FDA, rather than a tentative conclusion of Dr. Leber alone. "It is our opinion that adverse experiences summarized in the above articles alter the balance between the relative risks and benefits of this drug for men, and we believe that further labeling revisions are now warranted." Thus, this case is distinguishable from *Pullman,* 662 F.2d at 914, in which the court upheld exclusion of an interim government report which noted the need for further investigation and whose staff recommendation was not ultimately adopted by the head of the governmental agency.[5]

Although the Leber letter does not represent the result of such traditional inquiries as epidemiological studies or accident investigations, the most usual subjects of F.R.Ev. 803(8)(C), the court has found nothing in the cases or commentary to support the limitation of the rule to such instances. To the contrary, the weight of authority is that no formal proceedings are necessary to satisfy the prerequisites of the rule. *See In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 268 (3rd Cir.1983) (no evidentiary hearing or opportunity for cross-examination required), *rev'd on other grounds sub nom. Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 879 (1986). Nor is the form of the final record dispositive. *See Falcon v. General*

---

**5.** Because there is evidence that the FDA eventually abandoned its position, first expressed in the Leber letter, that Desyrel should be indi- cated for men only when other antidepressants were not useful, the court orders this paragraph redacted as a non-final opinion of the FDA.

*Tel. Co. of the Southwest*, 626 F.2d 369, 382 (5th Cir.1980) (admitting GSA letters, prepared as part of contract compliance review, which reported employment discrimination by defendant), *vacated on other grounds*, 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981). Rather, "[t]he indice of reliability for the governmental investigative report is the fact that it is prepared pursuant to a duty imposed by law." *Japanese Electronic Products*, 723 F.2d at 268.

Here Dr. Leber's letter was prepared pursuant to the FDA's statutory responsibility to regulate the safe marketing of prescription drugs. His conclusions were presumably guided by the standards contained in the detailed CFR regulations governing the contents of various drug label sections. *Id.* He relied on published reports in the medical literature, data on which an expert in the labeling field would ordinarily rely. *Id.* at 265 (relating factors relied on by district court in assessing trustworthiness of documents). Further investigation would have only disclosed more cases of priapism and concomitant surgery, and thus would not have changed the FDA's conclusions. Nor is there any reason to believe that Dr. Leber was biased in his investigation or assessment or that he ignored evidence or sources which would have altered his opinion. *See Smith*

*v. Ithaca Corp.*, 612 F.2d 215, 222 (5th Cir.1980) (admitting Coast Guard accident report); *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir.1978) (no evidence that highway patrolman "neglected any one source or impermissibly preferred one over another"), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979); *Revlon, Inc. v. Carson Products Co.*, 602 F.Supp. 1071, 1080 (S.D.N.Y.1985) (admitting affidavit of FDA director concerning agency's investigation of trade secret claim). In light of *Beech Aircraft*'s expansive reading of F.R.Ev. 803(8)(C), therefore, the court finds that the Leber letter comprises a report of "findings resulting from an investigation made pursuant to authority granted by law."[6]

With regard to F.R.Ev. 803(8)(C)'s second prong, the court finds that the Leber letter is trustworthy, particularly when analyzed in light of the Advisory Committee's four guiding factors. First, the report was not prepared in the context of litigation and there is no reason to suspect bias on the part of the FDA in this regard. Second, the expertise of Dr. Leber and his staff cannot reasonably be questioned; even though their personal qualifications are not in evidence, they were performing one of the central tasks assigned to them by law in recommending precautionary labeling changes.[7]

**6.** In *Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87, 94 (2nd Cir.1980), the court reversed the district court's admission of post-injury labeling changes as conclusions of the FDA under Rule 803(8)(C), stating that "insofar as the labeling changes may be said to 'reflect' FDA conclusions, they do not fall readily within the public record hearsay exception of Rule 803(8) ... since they deal with medical opinions not facts." However, *Lindsay* was decided prior to *Beech Aircraft* and relied on *Smith v. Ithaca Corp.*, *supra*, which propounded the restricted reading of Rule 803(8)(C) that the Supreme Court rejected in *Beech Aircraft*.

**7.** Defendant challenges the skill and expertise of Leber and his staff by noting that there is no evidence on these issues. Support for defendant's position may be found in *Matthews v. Ashland Chemical, Inc.*, 770 F.2d 1303, 1309–10 (5th Cir.1985) (affirming exclusion of fire investigator's report), in which the court wrote, "an appellate court should not rely merely on the title of the official or official body making the

report, but must look to additional considerations that indicate the special skill or expertise of the official or official body who made that report." *See also Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir.1978) (noting experience of highway patrol veteran in admitting his accident investigation report). However, in *Smith*, 612 F.2d at 222, cited by *Matthews* in support of the quoted proposition, the court merely relied on "the experience of the Coast Guard in investigating marine disasters," without examining the qualifications of the individual investigators who prepared the report in question. And in *Revlon*, 602 F.Supp. at 1080, in which the FDA director detailed his qualifications in his submitted affidavit, the court nonetheless relied in large part upon his position to establish his skill. "We find that Mr. Eiermann, as director of one of the divisions of the FDA, was an experienced and impartial official who made a statement under oath." *Id.* Given that courts will often lack evidence to assess the individual qualifications of government investigators in Rule 803(8)(C) situations, the court

Third, although the letter was issued some six months after publication of the Scher article, it is possible that it took that long for Leber to receive and analyze the piece. Moreover, the danger here is not that the FDA's investigation was based on stale evidence, but that it relied on *more* data than is relevant to this case.

Finally, while no hearing was held prior to issuance of the letter, the evidence suggests that Mead Johnson and the FDA had discussed other label changes relating to Desyrel and the risk of priapism in the past. Mead Johnson regulatory personnel apparently communicated closely with the FDA about labeling, often receiving information orally and getting a chance to comment before receiving written communications. In any event, the letter is introduced not to prove causation, an issue on which contrary evidence presented by defendant to the FDA may have changed the agency's conclusion, but to prove the FDA's opinion on the adequacy of defendant's labeling. Because the jury will be instructed that the FDA's opinion is not dispositive on the adequacy of the warning, defendant will have its chance to argue that its label was appropriate given its knowledge of the association of Desyrel with priapism as of October, 1983.[8]

The court acknowledges its discretion to exclude factual and evaluative statements in government reports that it finds to be untrustworthy. *Beech Aircraft,* 109 S.Ct. at 448–49. In *Smith v. Massachusetts Institute of Technology,* 877 F.2d 1106, 1113 (1st Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 406, 107 L.Ed.2d 372 (1989), a post-

*Beech Aircraft* case, the Court of Appeals for the First Circuit reaffirmed this discretion by upholding the district court's exclusion of three Equal Employment Opportunity Commission ("EEOC") investigative reports which plaintiff sought to admit in an age discrimination case. Significantly, the EEOC submitted an affidavit on behalf of defendant stating that the reports should not have been released to plaintiff under Commission policy and that the reports did not constitute official findings of the Commission. *Id.* at 1112–13. Here, by contrast, the Leber letter was sent directly to defendant, was part of the publicly open New Drug Application file, and represented the official position of the FDA. While the factual investigation underlying the Leber letter and the evaluation expressed therein were not as scientifically objective as the epidemiological studies or air crash investigations more usually found in F.R.Ev. 803(8)(C) cases, the court concludes they are trustworthy and otherwise satisfy the Rule's requirements for exception from the hearsay bar.[9]

### III. *The FDA Telephone Records*

■ Plaintiffs seek to introduce FDA records of two June, 1983 telephone conversations between Richard Yeager, of Mead Johnson's Regulatory Affairs department, and Mr. Barash, an FDA employee. According to plaintiffs, the notes, which conflict on certain points with Yeager's written record of the conversations, tend to show that the FDA requested that Mead Johnson not circulate a particular Desyrel

believes it is proper to presume that the official has the skill and expertise to perform the tasks assigned to him by law, and that it is the burden of the party opposing admission to establish through specific facts that the official lacks such skill. *Kehm,* 724 F.2d at 618.

8. For similar reasons, the court is not persuaded by defendant's contention that the letter should be excluded because it represented the FDA's "negotiating posture," rather than its objective opinion on required warnings. As indicated earlier, this opinion did not change. Moreover, sufficient evidence of the negotiated nature of drug labels has been admitted to allow defendant to argue this point and thus attempt to undercut the weight given the letter. In addi-

tion, as noted above, the court has redacted that portion of the letter proposing changes in the label's Indications section because it appears that the FDA eventually abandoned this request.

9. Defendant objects that plaintiffs seek to use the Leber letter as an expert opinion without foundation and the opportunity for cross-examination. Even assuming the truth of this argument, it is unpersuasive given the Supreme Court's discussion in *Beech Aircraft* of the relationship between opinion testimony and Rule 803(8)(C) and the clear purpose of the hearsay exceptions to permit the admission of trustworthy evidence even when cross-examination of the declarant is not possible. *Kehm,* 724 F.2d at 618.

package insert (the "04 insert") without making certain labeling changes that were eventually incorporated in the 05 insert approved by the FDA on October 24, 1983. In particular, Barash writes the following in a phone record dated June 9, 1983:

> I called the firm regarding supplement 006 which provides for revised labeling which was scheduled to go into effect this month. I was informed that while the proposed insert (P 2550–04) was printed up in large quantities, it has not yet been put into effect.
>
> I read him the revisions which we are requesting (from Dr. Kessler's review) particularly regarding the *Overdose* section.
>
> I informed him that our requested revisions should be incorporated into the labeling prior to this new labeling going into effect.
>
> Mr. Yeager said the matter would be discussed within the firm and he would be back in touch with us.

In a note dated June 13, 1983, Barash wrote:

> Mr. Yeager called to say that the firm has agreed to our requested labeling revisions.
>
> He requested that he submit unofficially a mock-up of the revised labeling to ensure it meets with our approval. In that way, there would be no delay in getting the new labeling printed up.
>
> I said such an approach sounded reasonable, and we would be back in touch with him after we've had the opportunity to look at the labeling.

Yeager's record of the first conversation, which was previously admitted into evidence without objection, states by contrast:

> I returned Mr. Barash's call. Mr. Barash read to me a draft of Dr. Kessler's

review of our outsert P2550–04. After discussing the review and her suggestions Mr. Barash said Dr. Kessler felt very strongly about the changes pertaining to overdose. He stressed that he had asked Dr. Kessler that if we had already used the –04 insert did she feel we should recall this production. Her response was that it was up to the firm (Mead Johnson) but she did feel very strongly about the overdose section, according to Barash.

> I called Mr. Barash back later and obtained a tape recording of his reading of the draft letter (transcript attached).

Defendant does not claim that the 04 insert was used prior to June 9, 1983. Both sides agree that the FDA regulations would have allowed the 04 insert to be used without FDA approval. *See* 21 C.F.R. § 314.70.

The Barash and Yeager memoranda are inconsistent on whether FDA approved or acquiesced in use of the 04 insert as it addressed priapism, and the former memoranda may be probative of whether the insert was ever used.[10] However, the probative value of the Barash notes on this point is marginal, considering that the notes do not explicitly state that defendant agreed not to distribute the 04 label. In addition, other evidence in the case, including Yeager's deposition testimony and trade advertisements from August, September and October, directly disclose the use of the 04 label during the pre–October, 1983 period. Admission of the Barash notes to prove that the 04 insert was not used would merely prompt a potentially lengthy and futile detour into a collateral issue in the case.

More importantly, the notes comprise inadmissible hearsay which is not encompassed by the public records exception to

---

**10.** Plaintiffs also claim that the Barash memoranda are relevant on a non-hearsay basis to impeach the cross-examination testimony of Dr. Kenneth Krantz, plaintiffs' labeling expert, that the FDA played a relatively passive role in the Desyrel labeling changes prior to October, 1983 and to impeach Yeager's deposition testimony that the 04 insert was distributed during the pre-October period. The court believes the former ground is a collateral issue which will not justify admission of the records in the absence

of any other relevant purpose. With respect to the latter ground, the memoranda impeach Yeager only to the extent that Barash's notes are accepted as true. Although Yeager's statements are themselves non-hearsay under F.R.Ev. 801(d)(2), Barash's out-of-court recordation of these statements, and of his own side of the conversation, is hearsay, which must fall under some exception to the hearsay rule if the documents are to be admitted to impeach Yeager. They do not.

the hearsay rule. Once again, F.R.Ev. 803(8) provides that the following items are excepted from the rule against hearsay:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ... or (C) ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Rules 803(8)(B) and (C) do not apply to the Barash notes, because the telephone conversations were neither "matters observed pursuant to duty imposed by law as to which matters there was a duty to report" nor "factual findings resulting from an investigation made pursuant to authority granted by law." Barash was not conducting a factual investigation while talking to Yeager. Nor was he performing a legally mandated duty of observation. Barash was only making handwritten memoranda of parts of conversations which occurred during the course of his work. While it may have been a regular practice of FDA employees to record the content of their phone conversations, and hence the records could theoretically be admissible under the business records exception, F.R.Ev. 803(6), plaintiffs have not laid an adequate foundation for application of this rule. Recordation of ordinary phone conversations, however, simply does not have the built-in indicia of reliability afforded by the existence of a legal duty and legal authority which underpins the F.R.Ev. 803(8)(B) and (C) exceptions. *See, e.g., Kehm,* 724 F.2d at 618 (discussing presumptive reliability of public reports).

The court also finds that F.R.Ev. 803(8)(A) is not applicable to the Barash memoranda. His notes are not confined to "the activities of" the FDA, but contain his recollection and understanding of the statements of himself and Yeager. Although the court recognizes that Yeager's statements are not hearsay under F.R.Ev. 801(d)(2), Barash's out-of-court recordation of the statements is itself hearsay. In addition, both Barash's statements during the phone conversation and his written record of those statements are hearsay. His notes are thus comprised primarily of hearsay and hearsay-within-hearsay and are not saved by what is essentially the public agency equivalent of the business records exception.

The dangers inherent in hearsay evidence are particularly prominent in the instant case, where Barash's memoranda differ at significant points with Yeager's written report of the conversation. It is in exactly such instances, when two parties, with potentially divergent personal interests, have differing interpretations or memories of ambiguous conversations, that the protections of testimony under oath and the opportunity for cross-examination are most needed. *See Blim v. Western Electric Co.,* 731 F.2d 1473, 1476–77 (10th Cir.) (Department of Labor report memorializing conversation with defendant's Equal Opportunity Coordinator admissible only where "fully tested and developed through the testimony" of the Coordinator), *cert. denied,* 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984).[11] Barash's out-of-court, written statements cannot be deemed trustworthy where they differ from other admissible evidence on the same conversation and where defendant has not been able to subject them to the rigors of cross-examination. For these reasons, and in light of their minimal probative value,

---

11. Interestingly, Professors Saltzburg and Redden "question" the holding in *Blim,* even though the report was verified by the Coordinator's testimony. They write:

It appears doubtful that the investigator routinely filed reports of all conversations with all persons. Thus, the report is arguably not a record of a regularly conducted activity. And it is less certain which part of Rule 803(8) the Court found that the report satisfied. To the extent that the report was conclusory or offered opinions, it probably goes beyond what part (B) would authorize, and the agent's recollection of what was said does not appear to be a factual finding by the DOL that would be admissible under part (C).

S. Saltzburg & K. Redden, *supra,* at 880.

the court concludes that the records are not admissible under F.R.Ev. 803(8) or any other exception to the hearsay rule, including the residual exception, F.R.Ev. 803(24).