SHIRLEY MELLO RODRIQUES vs. JOSEPH FURTADO &
                        others.[1]

Bristol. May 9, 1991. - August 12, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Civil Rights*, Immunity of public official, Availability of remedy, Coercion.
  *Privacy. Public Officer. Constitutional Law*, Search and seizure. *Search
  and Seizure*, Affidavit, Bodily intrusion.

A police officer, who submitted the affidavit pursuant to which a warrant
  was issued for a vaginal search of a woman suspected of concealing
  controlled substances, had qualified immunity from liability to the wo-
  man in an action under the Massachusetts Civil Rights Act, G. L.
  c. 12, §§ 11H, 11I, alleging violation of her State constitutional right
  to be secure against unreasonable searches and seizures, where it was
  not clearly established at the time of the search that the officer's con-
  duct, as alleged, would violate constitutional rights of which a reasona-
  ble police officer would have known. [881-884]
A police officer who, in making the affidavit pursuant to which a warrant
  was issued for the search of a woman's vagina, relied on information
  provided him by an unnamed informant, had qualified immunity from
  liability to the woman in an action under the Massachusetts Civil
  Rights Act, G. L. c. 12, §§ 11H, 11I, alleging violation of her State
  constitutional right to be secure against unreasonable searches and
  seizures where, if it be assumed that the affidavit fell short of establish-
  ing the basis of the informant's knowledge, the failure of the affidavit to
  establish probable cause would not have been apparent to a reasonably
  well-trained police officer. [884-887]
A civilian physician who, while on duty at a hospital emergency room, was
  called upon by police to execute a warrant for a vaginal search of a
  woman they had brought to the hospital, was entitled to qualified im-
  munity from liability to the woman in an action under the Massachu-
  setts Civil Rights Act, G. L. c. 12, §§ 11H, 11I, alleging that, by com-
  plying with the official request, the physician had violated her State
  constitutional right to be secure against unreasonable searches and
  seizures. [887]

[1]The city of Taunton, Morton Hospital, Inc., and Philip M. Falkoff.

In the exercise of its general powers of superintendence, this court determined that a warrant authorizing search of a person's body cavity may hereafter be validly issued only by a judge, upon a strong showing of particularized need supported by a high degree of probable cause. [887-888]

In an action under the Massachusetts Civil Rights Act by a woman who, pursuant to a warrant, had been subjected to a search of her vagina, the materials in summary judgment proceedings made no showing that a city, by having a policy permitting its police officers to seek such warrants, or a hospital where the search was conducted had interfered with the plaintiff's constitutional rights "by threats, intimidation or coercion" within the contemplation of the act. [889]

CIVIL ACTION commenced in the Superior Court Department on August 18, 1989.

The case was heard by *William H. Carey*, J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Paul W. Patten* for the plaintiff.

*Allen N. David* (*Chantal M. Healey* with him) for Joseph Furtado & another.

*Thomas E. Elcock* for Morton Hospital, Inc. & another.

LIACOS, C.J. On August 20, 1986, Joseph Furtado, a police officer for the city of Taunton (city), submitted an affidavit in support of a request for a warrant to search the plaintiff's vagina. The warrant was issued by an assistant clerk-magistrate of the Taunton Division of the District Court Department. A few hours later, the warrant was executed by Dr. Philip M. Falkoff, a physician at Morton Hospital (hospital) in Taunton. The plaintiff brought this action in Superior Court alleging that Furtado, the city, Dr. Falkoff, and the hospital interfered with her constitutional right under art. 14 of the Massachusetts Declaration of Rights to be free from unreasonable searches in violation of the State Civil Rights Act, G. L. c. 12, §§ 11H, 11I (1990 ed.) (SCRA).[2]

_____

[2]Prior to bringing this action in Superior Court, the plaintiff filed suit in United States District Court for the District of Massachusetts alleging vio-

The defendants filed motions for summary judgment pursuant to Mass. R. Civ. P. 56, 365 Mass. 824 (1974). A judge of the Superior Court granted the motions. The plaintiff appealed from the ensuing judgments. We transferred the case from the Appeals Court on our own motion. We conclude that the doctrine of qualified immunity protects Furtado and Dr. Falkoff from liability. We also conclude that there are no facts in the record to support the plaintiff's contention that the city and the hospital interfered with her constitutional rights "by threats, intimidation or coercion." G. L. c. 12, § 11H. We affirm. We note, however, that if the plaintiff's allegations are true, we would view the conduct of the police in this case as outrageous.

The facts of record, viewed in a light favorable to the plaintiff, are as follows.[3] On August 21, 1986, at approximately 1 A.M., Furtado and other police officers arrived at the plaintiff's apartment. The police officers had a warrant to search the apartment (this warrant is not in issue on this appeal) and a warrant to search the plaintiff's vagina for narcotics "to be conducted by a licensed physician at Morton Hospital." The officers knocked on the door and proceeded to force the door open. The plaintiff was in bed with her husband. Furtado entered the bedroom and told the plaintiff that he had a warrant to search her vagina. Furtado demanded that the plaintiff reach into her vagina and take out the "stuff," but she refused. The plaintiff and other members of her household (husband, daughter, grandson, and nephew) were then "herded" into the living room while the police

---

lations of 42 U.S.C. § 1983 (1988) and the SCRA. A summary judgment was granted in favor of the defendants on the § 1983 claim. The SCRA claim was dismissed without prejudice.

[3]While we state the facts in this fashion, see *Martin* v. *School Comm. of Natick*, 395 Mass. 461, 462 (1985), we note that various affidavits of the defendants dispute the plaintiff's allegations of use of force and crude behavior by the police officer and by medical personnel. In the view we take, the disputed facts as to the method of the search become immaterial. See Mass. R. Civ. P. 56 (c) (summary judgment may issue if no "genuine issue as to any *material* fact" [emphasis supplied]).

searched the apartment for two hours. The police failed to find any narcotics in the apartment.

At approximately 3:30 A.M., the plaintiff was taken to the hospital by Officer Jane McManus of the Taunton police department. After they arrived at the hospital, the plaintiff was left by McManus in an examining room. McManus then showed the warrant to Dr. Falkoff, the emergency room physician on duty. A few minutes later, Dr. Falkoff and a nurse entered the examining room. The plaintiff informed Dr. Falkoff that she was not consenting to being touched in any way. Dr. Falkoff left the room and telephoned Thomas Porter, the hospital's acting president and "on-call" administrator. Porter advised Dr. Falkoff of the hospital's consent policy and its policy that court orders be obeyed. Dr. Falkoff returned to the examining room and told the plaintiff that he was going to search her vagina. The plaintiff once again refused to consent to being touched by Dr. Falkoff. The nurse then grabbed the plaintiff by the shoulders and pushed her down onto the examining room table and placed her legs in stirrups.[4] Dr. Falkoff put on rubber gloves and proceeded to insert a probe into the plaintiff's vagina. He then removed the probe, placed one hand on the plaintiff's stomach, and inserted his "fingers or some other instrument" far into her vagina. No drugs were found inside the plaintiff's vagina.

1. *Qualified immunity.* We consider first whether Furtado and Dr. Falkoff are immunized from liability as matter of law. We conclude that they are immunized. Thus, it is not necessary to discuss the plaintiff's claim against Furtado and Dr. Falkoff, arising from the alleged violation of the SCRA, except to the extent that the claim affects the determination whether Furtado and Dr. Falkoff are entitled to immunity.

a. *Joseph Furtado.* The Legislature, in enacting the SCRA, intended to adopt the standard of immunity for public officials developed under 42 U.S.C. § 1983 (1988). *Duarte v. Healy*, 405 Mass. 43, 46 (1989). The United States Supreme Court has held that most public officials who exercise

---

[4]But see note 3, *supra.* These facts are disputed.

discretionary functions are entitled to qualified immunity from liability for damages under § 1983. *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982).[5] The Court in *Harlow* concluded that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The Court explained that qualified immunity is a necessary compromise between the need to provide remedies to individuals whose constitutional rights have been violated and the necessity of protecting public officials from "[i]nsubstantial lawsuits" which may deter them from carrying out their official responsibilities. *Id.* at 814.[6]

The plaintiff makes two arguments in support of her claim that her constitutional right to be free from unreasonable searches was violated. First, citing *Rochin* v. *California*, 342 U.S. 165 (1952), and *Schmerber* v. *California*, 384 U.S. 757 (1966), the plaintiff contends that a search of an individual's body cavities is always unconstitutional because of the intrusive nature of the search. In *Rochin*, the police, without a warrant, entered the defendant's home. The defendant, upon seeing the police, placed two small capsules into his mouth.

---

[5]The Court also has stated that some public officials such as judges, legislators, prosecutors, and the President of the United States are entitled to absolute immunity. See *Harlow* v. *Fitzgerald*, 457 U.S. 800, 807 (1982), and cases cited.

[6]In *Wood* v. *Strickland*, 420 U.S. 308, 322 (1975), the Court had held that the standard for qualified immunity should have both an objective and a subjective component. Thus, a public official will "not [be] immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [plaintiff]." *Id.* The Court in *Harlow*, however, eliminated the subjective component of the qualified immunity standard, reasoning that it was incompatible with the policy rationale of precluding insubstantial lawsuits from proceeding to trial since "questions of subjective intent . . . rarely can be decided by summary judgment." *Harlow* v. *Fitzgerald*, *supra* at 816.

The police struggled with the defendant in an attempt to extract the capsules. When this failed, the defendant was handcuffed and taken to a hospital where, at the direction of the officers, a physician forced an emetic solution through a tube into the defendant's stomach against his will. The defendant vomited, and the police found two capsules of morphine. *Id.* at 166. The Court reversed the conviction for possession of narcotics, concluding that the conduct of the police "shocks the conscience" and violated the defendant's right to due process. *Id.* at 172-174.[7]

In *Schmerber* v. *California, supra,* the police, also without a warrant, took a blood sample from the defendant who was arrested for driving an automobile while under the influence of alcohol. *Id.* at 758-759. The Court held that the search was reasonable even though there was no warrant because of the exigent circumstances (a delay would have reduced the level of alcohol in the blood), the intrusion was minor, and the test was performed in a reasonable manner. *Id.* at 770-771. The Court cautioned in dictum, however, that more substantial intrusions, or intrusions under other conditions, may be prohibited by the United States Constitution. *Id.* at 772.

*Rochin* and *Schmerber* do not support the plaintiff's argument that it was clearly established at the time her vagina was searched that such a search violated the Constitution. The fact that Furtado sought and was issued a warrant, while not dispositive, see *Malley* v. *Briggs,* 475 U.S. 335, 345-346 (1986), differentiates this case from *Rochin.* In addition, Furtado, unlike the police officers in *Rochin,* did not engage in a struggle with the plaintiff in an attempt forcibly to extract items from her vagina. *Schmerber,* on the other

---

[7]The plaintiff, in her complaint, does not argue that her substantive due process rights were violated. Instead, her claim is that the search of her vagina was unreasonable. "*Rochin* was decided on 'substantive' due process grounds before *Mapp* v. *Ohio,* 367 U.S. 643 . . . (1961), had extended the reach of fourth amendment protections to state action. But its standard for gauging the fundamental fairness of bodily intrusions under due process guarantees applies as well to gauging the reasonableness of body searches under fourth amendment guarantees." *Lee* v. *Winston,* 717 F.2d 888, 899 n.13 (4th Cir. 1983), aff'd, 470 U.S. 753 (1985).

hand, dealt with the exigent circumstances exception to the warrant rule, and, while the Court in that case was concerned with the intrusive nature of searches "involving intrusions beyond the body's surface," *id.* at 769, it did not state, in its holding or in dictum, that such searches are per se unconstitutional. We cannot say that a reasonable police officer in Furtado's position would have known that the search of the plaintiff's vagina violated constitutional rights which were clearly established at the time of the search. See *Duarte* v. *Healy, supra* at 48-49. Compare *Hopper* v. *Callahan,* 408 Mass. 621, 625 (1990) (constitutional rights of involuntarily committed individuals clearly established at time of defendants' acts).[8]

The second argument raised by the plaintiff involves the affidavit which Furtado presented to the magistrate in support of the issuance of the warrant. The affidavit relied on information provided by a confidential informant. "When law enforcement officials use an informant's tip as the basis

---

[8]There is much law on the constitutionality of body cavity searches in prisons. See, e.g., *Bell* v. *Wolfish,* 441 U.S. 520 (1979); *Langton* v. *Commissioner of Correction,* 404 Mass. 165 (1989); *Blackburn* v. *Snow,* 771 F.2d 556 (1st Cir. 1985); *Arruda* v. *Fair,* 710 F.2d 886 (1st Cir. 1983), cert. denied, 464 U.S. 999 (1984). We do not think that those cases are germane to the present case because of the "diminished" Fourth Amendment rights of prisoners, see *Bell* v. *Wolfish, supra* at 557, 558-560, and their visitors, see *Blackburn* v. *Snow, supra* at 563.

In *Winston* v. *Lee,* 470 U.S. 753 (1985), the Court upheld the decisions of the lower Federal courts that intrusive surgery to recover a bullet in the body of the defendant would not be a "reasonable" search under the Fourth Amendment to the United States Constitution. The Court stated: "Notwithstanding the existence of probable cause, a search for evidence of a crime may be unjustifiable if it endangers the life or health of the suspect." *Id.* at 761. In contrast, in *United States* v. *Montoya de Hernandez,* 473 U.S. 531, 541 (1985), a border search case, the Court upheld the detention of a traveler for several hours on a showing of "reasonable suspicion." During the period in which the traveler was detained, a warrant was issued which authorized a rectal examination of the traveler. *Id.* at 535. No Massachusetts decision under art. 14 on body cavity searches has been cited, nor have we discovered any. We do not decide today the issues whether body cavity searches are precluded totally under art. 14. For the purpose of this case, it suffices that the law was not "clearly established" when Furtado obtained the warrant.

for a[ ] . . . search, art. 14 . . . requires that the Common-
wealth satisfy the two-pronged test set out in *Aguilar* v.
*Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*,
393 U.S. 410 (1969). The Commonwealth 'must demonstrate
some of the underlying circumstances from which (a) the in-
formant gleaned his information (the "basis of knowledge"
test), and (b) the law enforcement officials could have con-
cluded the informant was credible or reliable (the "veracity"
test).' *Commonwealth* v. *Cast*, 407 Mass. 891, 896 (1990)."
*Commonwealth* v. *Frazier, ante* 235, 239 (1991).

While the plaintiff is correct when she argues that the
*Aguilar-Spinelli* requirements were clearly established at the
time Furtado applied for the warrant, that is not sufficient to
preclude Furtado from using a qualified immunity defense.
See *Anderson* v. *Creighton*, 483 U.S. 635, 639-640 (1987).
Instead, the dispositive question "is whether a reasonably
well-trained [police] officer in [Furtado's] position would
have known that his affidavit failed to establish probable
cause and that he should not have applied for the warrant. If
such was the case, [Furtado's] application for a warrant was
not objectively reasonable, because it created the unnecessary
danger of an unlawful [search]." *Malley* v. *Briggs, supra* at
345.

The confidential informant's belief that the plaintiff kept
narcotics in her vagina was based on the fact that he or she
once went to the plaintiff's apartment, and after the inform-
ant requested a "fix," the plaintiff "[took] the money and
enter[ed] the bath room only to return with the works all
ready to shoot up."[9] The confidential informant also heard

---

[9]Furtado's affidavit contained fifteen paragraphs. Two of those para-
graphs are relevant to the issue of the confidential informant's basis of
knowledge:

"7. That this officer contacted one of the three confidential reliable in-
formants that furnished us . . . with information which lead to the search
of Shirley Mello Rodriquez and Raul Colon Rodriquez apartment [on
June 14, 1986]. In asking the informant if Shirley and Raul were still
active in the distribution of narcotics it went on to say it never stopped.
The informant asked if we had searched her vagina for that is where she is

other individuals talking about the fact that the plaintiff kept drugs in her vagina.

Even if we were to assume, without deciding, that the affidavit failed the "basis of knowledge" test of *Aguilar-Spinelli*, we cannot conclude that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley* v. *Briggs*, *supra* at 345.[10] The fact that an affidavit fails the "basis of knowledge" test is not sufficient to overcome a qualified immunity defense. If this were not the case, a police officer would be liable every time he or she files an affidavit which lacks probable cause. The imposition of liability on a police officer because an affidavit lacks probable cause would "dampen the ardor of all but the most resolute, or the most irresponsible [police officers]." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 814 (1982), quoting *Gregoire* v. *Biddle*, 117 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950). "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials — like other officials who act in ways they reasonably believe to be lawful — should

---

hiding what ever she is holding. . . ."

"12. That on Aug. 20th, 1986, this officer was contacted by the same informant mentioned in paragraph #7 and it said that it had just left Shirley Mello Rodriquez and Raul Colon Rodriquez at [their] apartment and that Raul Colon Rodriguez just came in with a large amount of Black Flag. Black Flag is also called black hero or black tar. This informant said that it is kept under the kitchen sink and that there is a strong possibility that Shirley Mello Rodriquez might be holding some in a rubber in her vagina. The informant said that there is also cocaine in the apartment. That this officer asked the informant what made it [believe] that it would be kept in her vagina and it went on to say that on one occasion it went to [Shirley's] and in asking for a fix Shirley would take the money and enter the bath room only to return with the works all ready to shoot up, and that he has heard other people talking about it, especially from Paul Guzman who is real close to Shirley. It said that when with Paul Guzman, Paul would say that she was holding the stuff up her and point to the groin area."

[10]We note, however, that in terms of satisfying the "basis of knowledge" test as to whether the plaintiff kept narcotics in her vagina, the affidavit is at best marginal.

not be held personally liable." *Anderson* v. *Creighton, supra* at 641.

b. *Dr. Philip M. Falkoff.* The judge granted summary judgment in favor of Dr. Falkoff based on *LaLonde* v. *Eissner*, 405 Mass. 207 (1989). In *LaLonde*, we held that a psychiatrist who was designated by the probation department pursuant to a court order to perform a psychiatric evaluation of a child was entitled to absolute immunity because of the quasi judicial nature of the psychiatrist's assignment. *Id.* at 213. We need not decide whether Dr. Falkoff should receive absolute immunity, since he is entitled to qualified immunity which is sufficient to protect him from liability. See *Mulgrew* v. *Taunton, ante* 631, 634-635 (1991).

While private parties such as Dr. Falkoff usually are not entitled to the defense of qualified immunity, see *Downs* v. *Sawtelle*, 574 F.2d 1, 15 (1st Cir.), cert. denied, 439 U.S. 910 (1978) (under § 1983, qualified immunity does not protect private actors who allegedly conspired with State actors to violate plaintiff's constitutional rights), Dr. Falkoff in this case performed a duty customarily carried out by a public employee, namely the execution of a warrant.[11] Policy and fairness considerations militate in favor of extending immunity to physicians who, pursuant to a warrant, conduct searches of body cavities. If a law enforcement official would be entitled to immunity for executing a particular warrant, it would be anomalous to deny a private physician immunity for executing the same warrant. Since it was not "objectively unreasonable" for Furtado to have sought a warrant in this case, we cannot conclude that it was objectively unreasonable for Dr. Falkoff to have executed the warrant. See *Malley* v. *Briggs, supra*; *Harlow* v. *Fitzgerald, supra.*

Even though we conclude that Furtado and Dr. Falkoff are entitled to qualified immunity which shields them from liability, we are nonetheless deeply troubled by the search

---

[11]We note that the SCRA, unlike § 1983, does not require State action. *Bell* v. *Mazza*, 394 Mass. 176, 182 (1985). Whether State action is required under the SCRA, however, does not affect the issue of Dr. Falkoff's immunity.

which was conducted in this case. The fact that the plaintiff was taken to the hospital by the police in the middle of the night to have her vagina searched raises, at the very least, the possibility that the police were more interested in intimidating the plaintiff than they were in finding narcotics. It is difficult to imagine a more intrusive, humiliating, and demeaning search than the one conducted inside the plaintiff's body. In cases such as the present one, where the police seek to conduct a search inside the body of an individual, it may be appropriate to require a higher level of certainty than "mere" probable cause. If less than probable cause is required in cases where the level of intrusion is relatively low, see *Terry v. Ohio*, 392 U.S. 1, 26 (1968), it may be appropriate to require a higher level of certainty in cases involving extremely intrusive searches. Additionally, we think it sound policy to require that, in the future, such a warrant be issued only by a person legally trained, i.e., a judge. Thus, at the very least, in the future, under the exercise of our general superintendence powers, we shall deem a warrant authorizing the search of a body cavity to be invalid unless issued by the authority of a judge, on a strong showing of particularized need supported by a high degree of probable cause.[12] We must, however, leave the development of this rule for another day when we shall be able to analyze fully the constitutional implications of these types of highly intrusive searches without being constrained by the doctrine of qualified immunity.[13]

---

[12] The warrant which authorized the search of the plaintiff's apartment, and the affidavit submitted by the police in support of the issuance of that warrant, are not part of the record. We are of the view, however, that, in cases involving the search of a body cavity, there must be a high degree of probable cause to believe that contraband is inside the cavity *independently* whether there is probable cause to believe that the individual searched is hiding contraband elsewhere in his or her home or on his or her person.

[13] Even if we were to conclude today that more than probable cause is required before an individual's body cavity can be searched, it would not benefit the plaintiff, since such a rule was not clearly established at the time the search in this case was conducted.

2. *The city and the hospital.* The plaintiff argues that the
city should be liable under the SCRA because it has a policy
whereby experienced police officers such as Furtado may
seek warrants without the authorization of supervisors. The
plaintiff, however, fails to explain how the city, by having
such a policy, interfered with her constitutional right to be
free from unreasonable searches "by threats, intimidation or
coercion." G. L. c. 12, § 11H. There is no evidence in the
record that the city, directly or indirectly through Furtado,
threatened, intimidated, or coerced the plaintiff. See *Bally* v.
*Northeastern Univ.*, 403 Mass. 713, 719 (1989); *Deas* v.
*Dempsey*, 403 Mass. 468, 470-471 (1988).[14] Similarly, there
is no evidence in the record that the hospital, through its
agent Thomas Porter (who advised Dr. Falkoff of the hospi-
tal's policies on consent and court orders), interfered with the
plaintiff's constitutional right to be free from unreasonable
searches through threats, intimidation, or coercion. See *Bally*
v. *Northeastern Univ.*, *supra*; *Deas* v. *Dempsey*, *supra*.

*Judgments affirmed.*

---

[14]The United States Supreme Court has held that a municipality will be
liable under § 1983 only "when execution of a government's policy or cus-
tom, whether made by its lawmakers or by those whose edicts or acts may
fairly be said to represent official policy, inflicts the injury" to the plaintiff.
*Monell* v. *Department of Social Servs. of the City of N.Y.*, 436 U.S. 658,
694 (1978). The plaintiff argues that the city's policy satisfies *Monell*. We
need not decide, however, whether the Legislature intended to adopt the
*Monell* standard when it enacted the SCRA since there is no evidence that
the city interfered with the plaintiff's alleged constitutional rights through
threats, intimidation, or coercion.