Connolly, J.
Defendant, Jude Eugene, stands indicted for trafficking in and possession of a controlled substance with the intent to distribute. Defendant now moves to suppress evidence derived from warrantless searches of his anal cavity and the vehicle in which he was a passenger on the ground that they were conducted in violation of the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution and articles 12 and 14 of the Massachusetts Declaration of Rights.
On March 24 and 25, 1997,1 conducted an evidentiary hearing. For the reasons stated below, defendant’s motion to suppress is ALLOWED.
FINDINGS OF FACT
In the fall of 1995, a confidential informant (Cl) told Trooper Christopher Meiklejohn, a Massachusetts State Police officer assigned to the Berkshire Crime *4 Prevention and Control (CPAC) Unit of the District Attorney’s office, that defendant travels from Pittsfield, Massachusetts to Springfield, Massachusetts to purchase cocaine. A records check revealed that defendant had two previous drug convictions.
In September 1996, the Cl informed Trooper Meiklejohn that defendant was dealing crack cocaine. Trooper Meiklejohn also learned that defendant was still traveling to Springfield and using a pager to sell crack cocaine. The Cl stated that George Hebert (“Hebert”) was one of the persons who drove defendant to Springfield and that when they were together it was for the purpose of engaging in drug transactions. Trooper Meiklejohn knew that defendant’s license was suspended and that he must need rides for many purposes.
The Cl acquired its information from four customers who purchased cocaine directly from defendant. Additionally, the Cl saw defendant in possession of cocaine. It also identified him from an unmarked Pittsfield Police Department photograph. The Cl was known to Trooper Meiklejohn because it had previously participated in controlled buys for the officer.
On October 19, 1996, the Cl notified Trooper Meiklejohn that defendant and Hebert left Pittsfield at 12:30 p.m. and were driving southbound on Route 7 to Springfield. The Cl obtained this information from another person. A check of Hebert’s motor vehicle records revealed that a truck was registered in his name.
Trooper Meiklejohn has conducted over 100 narcotics investigations. He estimated that a drive between Pittsfield and Springfield would take approximately two and one-half hours round trip; He also took into account that Springfield is a major supply area for drugs, dealers ordinarily use vehicles which belong to others, and persons other than the drug dealer usually drive these vehicles. He was also aware that Exit 2 of the Massachusetts Turnpike was a usual route for travelers between Pittsfield and Springfield. Based on the information from the Cl and the above factors, Trooper Meiklejohn and Trooper Angelo Valentini, a Massachusetts State Police officer who was stationed at Lee, set up a surveillance at Exit 2.
Plain-clothes officers spotted a two-toned brown pickup truck occupied by a white male driver and a black male passenger wearing a hat on the Massachusetts Turnpike at Broad Street. Thereafter, at a time which would approximate the arrival of a vehicle which left Pittsfield at 12:30 p.m., Troopers Meiklejohn and Valentini, sitting in a marked cruiser, saw the truck appear on Route 20 at East Street. When the truck passed, the officers observed the passenger ducking down in his seat. They proceeded to follow the truck along Route 20 and noted that the passenger continued to remain out of view. The officers activated the cruiser’s blue lights and, at approximately 4:30 p.m., stopped the truck on Route 7 northbound in Lenox.
The truck pulled over into the breakdown lane of the highway. Five police cruisers containing at least six officers surrounded the truck. Troopers Meiklejohn and Valentini approached the truck with their guns drawn and ordered the occupants to show their hands. As he approached, Trooper Meiklejohn wore a gray wool mask which exposed only his eyes to protect the Cl’s identity. He did not display a badge which identified him as a police officer.
The officers ordered the two occupants to exit the truck. Trooper Meiklejohn identified defendant as the passenger. Hebert was the driver. Defendant and Hebert were ordered to place their hands behind their heads. The police subjected defendant and Hebert to a pat-frisk search for weapons. The search of defendant yielded a pager and a police badge. Thereafter, the police then separated the two men, taking defendant to stand near one cruiser while detaining Hebert spread-eagled over another cruiser for approximately twenty minutes.
Trooper Meiklejohn began to interrogate defendant. When asked where he had been, defendant stated that he went to the Better Business Bureau in Springfield to register a complaint about a delay in the painting of his vehicle. Defendant showed Trooper Meiklejohn a receipt for an auto body shop which had no name at the top. The officer stated that he did not believe defendant.
Trooper Meiklejohn then ordered defendant to remove his boots. The officer looked inside the boots and shook them. Next, following the officer’s instructions, defendant dropped his pants. Trooper Meiklejohn patted defendant down, touching his genitals through his underwear. Trooper Meiklejohn also went through defendant’s pants pockets. Asked why he was ducking down in the truck, defendant claimed that he was removing a broken tape from the cassette player. Throughout this process, defendant was standing in the breakdown lane of Route 7 with his pants down for approximately two minutes as heavy traffic passed.
While Trooper Meiklejohn interrogated defendant, other officers were searching the truck. The search yielded defendant’s mail and a razor blade from the front passenger side of the vehicle. Additionally, Trooper John Chiaretta, a Massachusetts State Police officer assigned to the canine unit, arrived at the scene with a narcotics dog named Marco. Marco sniffed both the outside of the truck and the inside cab, but detected no drugs. Defendant testified that the dog also sniffed up and down his legs and private area while his pants were down. Trooper Chiaretta denied this, stating that the dog does not sniff human beings. I credit Trooper Chiaretta’s testimony.
While detaining Hebert spread-eagled over another cruiser, the police stated that they knew he and defendant had drugs in their possession and that Hebert *5 was only an addict and defendant the dealer. They warned him to cooperate before the drugs were found. Hebert was also warned not to give Trooper David Foley some lame story that insulted the officer’s intelligence. Hebert is of limited intelligence.
After approximately twenty minutes, Hebert told Trooper Foley that he believed defendant went to Springfield with a dual purpose: to visit the Better Business Bureau and to procure crack cocaine from a house. Defendant promised to pay for Hebert’s gas and give him a piece of cocaine. Defendant remained in the house for ten to fifteen minutes, but had nothing in his hands as he exited. Hebert never saw any drugs. He also told the officers that defendant ducked down in the truck and asked where the cruiser was located as they passed it. While ducking down, defendant placed his hand in the back of his pants and in between his buttocks. Hebert stated that the truck’s tape player was functioning normally.
Based on the information obtained from Hebert, Trooper Meiklejohn decided to conduct another strip search of defendant. He told defendant “you’re going to strip for me” and, with Trooper Valentini, placed defendant into the back of a cruiser. Trooper Meiklejohn ordered defendant to completely disrobe in the back seat of the car. One or both of the officers assisted defendant in raising his buttocks off the seat because of stitches on his arm. Defendant’s buttocks were spread. There was a conflict in testimony as to who spread his buttocks. Defendant states that Trooper Meiklejohn spread them. However, Trooper Meiklejohn testified that he merely instructed defendant to spread his own buttocks. Because Trooper Meiklejohn at least admits giving defendant instructions, I can fairly infer that defendant did not volunteer to spread his buttocks.
When defendant’s buttocks were spread, Trooper Valentini heard a “crinkling noise” that sounded like the muffling of saran wrap or cellophane. The officers then ordered defendant to redress and step out of the cruiser. Thereafter, they instructed him to drop his pants again.
Both defendant and Hebert testified that the officers made defendant stand spread-eagled against the guardrail with his underwear off and his entire buttocks exposed. The officers, on the other hand, offered contradictory testimony as to who removed defendant’s underwear and whether his buttocks were exposed to the traveling public. Trooper Meiklejohn stated that he pulled the underwear back, peered between defendant’s buttocks, and saw a small piece of plastic. However, Trooper Valentini testified that Trooper Meiklejohn never touched defendant despite the fact that both officers wore gloves for their own safety. In addition, contradicting Trooper Meiklejohn’s prior testimony, other officers testified that defendant’s buttocks remained in the car although he was fully standing up outside the car. In light of these significant inconsistencies, I credit defendant and Hebert’s testimony.
Trooper Meiklejohn inserted his finger into defendant’s anal cavity and pulled out a plastic bag containing approximately seventeen grams of cocaine. As he located and removed the drugs, Trooper Meiklejohn exclaimed “Bingo.” The officers then pulled up defendant’s underwear and pants. Trooper Meiklejohn then read defendant his rights and took him to the State Police barracks in Lee.
RULINGS OF LAW
A. Illegal Arrest
Defendant contends that the evidence derived from the pat-down frisk and truck search must be suppressed because they occurred during an illegal arrest. Specifically, he argues that there was no probable cause to stop Hebert’s truck because the Cl learned of defendant’s rumored drug purchase and subsequent departure from Springfield from an unreliable drug customer. He also states that his ducking down in the truck contributed nothing to a finding of probable cause.
Prior to addressing the issue of probable cause, I must first determine whether the stop of Hebert’s truck constituted an arrest or an investigatoiy inquiry. In making this determination, it is necessary to consider “the degree to which the defendant’s movement is restrained, the degree of force used by the police, and the extent of the intrusion.” Commonwealth v. Sanderson, 398 Mass. 761, 766 (1986). The length of the encounter, the nature of the inquiry, the possibility of flight, and the danger to the safety of the officers or the public are factors ordinarily included within this consideration. Commonwealth v. Willis, 415 Mass. 814, 820 (1993). Moreover, in an automobile stop situation, the number of police officers used to effect the stop, whether the police impeded the movement of the automobile, and whether the police had their guns drawn and in view are additional factors to be considered. Commonwealth v. Bottari, 395 Mass. 777, 781 (1985), citing United States v. Marin, 669 F.2d 73, 81 (2d Cir. 1982). ”[I]f, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave, a seizure has occurred within the meaning of both the Fourth Amendment and article 14.” Commonwealth v. Borges, 395 Mass. 788 (1985), quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980).
In light of the facts and circumstances of this case, the stop of Hebert’s vehicle constituted an arrest. When Hebert’s truck stopped in the breakdown lane on Route 7, five cruisers containing at least six police officers surrounded his vehicle. Although the record is devoid of any testimony that the occupants of the truck were suspected to be armed and dangerous, Troopers Meiklejohn and Valentini approached the vehicle with their guns drawn and ordered defendant and Hebert to show their hands and exit the truck. *6 Further, while the total length of the detention is unknown, it is clear that at least twenty minutes had elapsed between the time of the initial stop and the time that the officers decided to strip search defendant. During this twenty minute period, the officers questioned defendant and Hebert persistently, frisked them, searched the truck, and brought a narcotics dog to the scene. Such a massive show of force would cause a reasonable person to believe that he is not free to leave. Compare Willis, supra, at 820-21 (blocking suspect’s vehicle and approaching him with guns drawn not an arrest where police reasonably believed he was armed with loaded shotgun) with Commonwealth v. Stawarz, 32 Mass.App.Ct. 211, 214-15, rev. denied, 412 Mass. 1104 (1992) (presence of eight to ten officers, approach of two officers without guns drawn, and blocking movement of suspect’s car constituted an arrest). Thus, the stop implicated defendant’s rights under the Fourth Amendment of the United States Constitution and article 14 of the Massachusetts Declaration of Rights.
A warrantless arrest is valid under both the Fourth Amendment and article 14 if it is based on probable cause. Commonwealth v. Santaliz, 413 Mass. 238, 240 (1992). “(P)robable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense.” Id. at 241, quoting Commonwealth v. Storey, 378 Mass. 312, 321 (1979), cert. denied, 446 U.S. 955 (1980). To establish probable cause under article 14, information known to the police at the time of the arrest must satisfy the Aguilar-Spinelli test. Commonwealth v. Cast, 407 Mass. 891, 896 (1990); Commonwealth v. Bottari, 395 Mass. 777, 783 (1985). Under the two-pronged test, the Commonwealth must establish “some of the underlying circumstances from which (a) the informant gleaned his information (the ‘basis of knowledge’ test), and (b) the law enforcement officials could have concluded the informant was credible or reliable (the ‘veracity’ test).” Cast, supra, at 896. Deficiencies in either of these prongs may be compensated for by a detailed tip corroborated by independent police investigation. Id.
In this case, there was no probable cause to stop Hebert’s truck. The Cl who informed Trooper Meiklejohn that defendant purchased drugs in Springfield did not have personal knowledge of this information; rather, the Cl received this information from an alleged drug customer of defendant. The officers failed to offer testimony establishing the basis of the customer’s knowledge or reliability. See Commonwealth v. Kuszewski, 385 Mass. 802, 804-05 (1982) (Aguilar-Spinelli test not satisfied where affidavit failed to set forth basis of knowledge of informant’s friend). Further, the officers failed to corroborate whether defendant actually went to Springfield because their only investigation consisted of surveilling the truck as it traveled towards Lenox and observing him duck down when it passed the police cruiser. Therefore, I agree with defendant’s contention that the troopers relied on nothing more than innocuous facts to justify stopping Hebert’s truck.
Because the troopers lacked probable cause to stop the vehicle, they illegally arrested defendant and Hebert. Therefore, the pager, badge, mail, and razor blade seized as a result of the frisks and search of the truck shall be suppressed.
B. Body Cavity Search
Next, defendant asserts that the drugs removed from his rectum should be suppressed. He contends that Trooper Meiklejohn conducted an impermissible body cavity search in violation of article 14 by extracting the cocaine without probable cause or a warrant. He further argues that the warrantless search along a public highway during the afternoon rush hour violated the due process clause of the Fourteenth Amendment of the United States Constitution because it “shocked the conscience.”
The Supreme Judicial Court recognized the extremely intrusive nature of body cavity searches in Rodrigues v. Furtado, 410 Mass. 878 (1991). In Rodriques, the plaintiff brought a civil rights action against several defendants, including a Taunton police officer, because a private physician searched her vagina for narcotics at approximately 3:30 a.m. pursuant to a warrant issued by an assistant-clerk magistrate. Although it affirmed a grant of summary judgment in favor of the officer and physician, the Court was deeply troubled by such an intrusive search in the middle of the night and suspected the police’s main objective was to intimidate the plaintiff, rather than to find narcotics. Id. at 887-88. Criticizing the police, the Court stated “(i]t is difficult to imagine a more intrusive, humiliating, and demeaning search than the one conducted inside the plaintiffs body.” Id. at 888. Consequently, the Court mandated that future body cavity searches be conducted only pursuant to a warrant issued by a judge “on a strong showing of particularized need supported by a high degree of probable cause." Id.
Despite the Commonwealth’s contentions, the police’s conduct amounted to a body cavity search of defendant’s anal area. While the Supreme Judicial Court has not dealt with the question of the scope of actions which constitute a body cavity search, a case from the First Circuit Court of Appeals is instructive. In Blackburn v. Snow, 771 F.2d 556 (1st Cir. 1985), the First Circuit reviewed the constitutionality of the requirement by the Plymouth County Jail that all visitors to the prison submit to a strip search prior to visiting inmates. The plaintiff was subjected to three searches on three separate occasions, at least one of which involved the manual spreading of her buttocks. Noting that body caviiy searches are “demeaning, dehumanizing, undignified, humiliating, terrifying, *7 unpleasant, embarrassing, repulsive, and signify degradation and submission,” the First Circuit determined that the spreading of the plaintiffs buttocks constituted a manual body cavity search.[1] Id. at 564, quoting Arruda v. Fair, 710 F.2d 886, 887 (1st Cir.), cert. denied, 464 U.S. 999 (1983); see Bell v. Wolfish, 441 U.S. 520, 577-78 (1979) (Marshall, J., dissenting) (bending over, spreading of buttocks, and displaying anal cavity constitutes body cavity search). Similarly, defendant was subjected to a manual body cavity search first when he was ordered to spread his own buttocks and then when Trooper Meiklejohn later inserted a finger into his rectum. Therefore, the police were required to comply with the standard imposed by the Supreme Judicial Court in Rodriques.
The cocaine extracted from defendant’s rectum must be suppressed because the police failed to obtain a warrant before searching his anal cavity. Irrespective of the question as to whether there was probable cause to search defendant’s body cavity,[2] it is undisputed that Trooper Meiklejohn inserted his finger into defendant’s rectum along a public highway. The Commonwealth presented absolutely no evidence of exigent circumstances which would have made obtaining a warrant impractical. Nor did defendant consent to the body cavity search because he merely followed Trooper Meiklejohn’s instructions to spread his own buttocks. Therefore, because the body cavity search was conducted without a warrant, the cocaine shall be suppressed.
In addition to ruling that the police conducted an illegal search without a warrant, I also rule that their conduct shocks the conscience. Conduct ordinarily shocks the conscience and, thus, violates the due process clause of the Fourteenth Amendment of the United States Constitution, when police action transcends certain decencies of civilized conduct. See Rochin v. California, 342 U.S. 165, 172-73 (1952) (police conduct of illegally entering defendant’s home, struggling to force his mouth open, and subjecting him to coerced stomach pumping likely to “offend even hardened sensibilities"). Because body cavity searches “represent one of the most grievous offenses against personal dignity and common decency,” Bell v. Wolfish, 441 U.S. 520, 577 (1979) (Marshall, J., dissenting), such searches under abusive conditions can easily fall within the scope of conduct that shocks the conscience. In the instant case, the police’s conduct shocks the conscience because they subjected defendant to three increasingly intrusive searches which required him to remove his clothes and ultimately expose his buttocks to the traveling public along Route 7 during the afternoon rush hour. Contrast United States v. Dorlouis, 107 F.3d 248, 256 (4th Cir. 1997) (strip search not unconstitutional where search occurred in privacy of police vehicle, defendant’s boxer shorts not removed, and officers knew that defendant possessed $1,600 in marked money). Thus, the police’s conduct also violated the due process clause of the Fourteenth Amendment.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendant’s motion to suppress is ALLOWED.

 The First Circuit distinguished between strip searches and body cavity searches. “A ‘strip search,’ though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject’s body cavities. A ‘visual body cavity search’ extends to visual inspection of the anal and genital areas. A ‘manual body cavity search’ includes some degree of touching or probing of body cavities.” Blackburn, 771 F.2d at 561, n.3, citing Security & Law Enforcement Employees v. Carey, 737 F.2d 187, 192 (2d Cir. 1984).

 Defendant contends that the statements he and Hebert gave to police during the stop cannot be used to establish probable cause to search his rectum. I agree because the stop itself constituted an illegal arrest.