Edward A. CANNEY, Plaintiff,

v.

CITY OF CHELSEA; Lewis H. Spence, Individually and as Deputy Receiver and Receiver of the City of Chelsea; Steven McGoldrick, Individually and as Chief of Staff of the Receiver of the City of Chelsea; and Carol Gladstone, Individually and as Deputy Receiver of the City of Chelsea, Defendants.

Civ. A. No. 95–11015–WGY.

United States District Court, D. Massachusetts.

May 7, 1996.

John J. Washburn, John J. Washburn, North Reading, MA, for Plaintiff.

Kristen Reasoner Apgar, City Solicitor, Chelsea, MA, Kara M. Lucciola, Attorney General's Office, Boston, MA, John J. Davis, Todd M. Reed, Morrison, Mahoney & Miller, Boston, MA, for Defendants.

### *MEMORANDUM AND DECISION*

YOUNG, District Judge.

### I. Introduction

This is a rather unique lawsuit, a case of first impression within this Circuit—or any other Circuit nationwide, for all I can tell. It comes before this Court courtesy of the Plaintiff, Edward A. Canney ("Canney"), a former Director of Inspectional Services for the City of Chelsea. Canney has filed a wrongful termination suit against the City of Chelsea ("Chelsea") and three city officials who have been named in their individual and official capacities: Lewis H. Spence ("Spence"), Receiver of the City of Chelsea; Steven McGoldrick ("McGoldrick"), Spence's Chief of Staff; and Carol Gladstone ("Gladstone"), the Deputy Receiver of the City of Chelsea.[1] His sixteen-count complaint lists numerous violations of Massachusetts contract, tort, and civil rights statutes as well as violations of 42 U.S.C. §§ 1983, 1985, and 1986.[2] As relief for his alleged wrongful discharge, Canney seeks reinstatement by Chelsea and monetary damages.

Chelsea moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, and the Co–Defendants moved to dismiss under Fed.R.Civ.P. 12(b)(3) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim. At a motion session held on January 11, 1996, this Court ruled that Chelsea was not liable for the Co–Defendants' actions, and granted Chelsea's Motion to Dismiss. The Court also granted in part and denied in part the Co–Defendants' Motion to Dismiss. This opinion explains why.

### II. Background and Statement of Facts

At the time of the alleged events, Chelsea was operating in a state of receivership pursuant to "An Act Establishing a Receivership for the City of Chelsea," codified in Chapter 200 of the Acts and Resolves of 1991 (the "Receivership Act"). To the best of the Court's knowledge, the state legislature has not had to resort to this extraordinary remedy for a city or town within the Commonwealth in more than fifty years. The story behind the passage of the Receivership Act is as follows: By August, 1991, Chelsea was in

1. For the sake of simplicity, Co–Defendant City of Chelsea will be referred to as "Chelsea" and the individual Co–Defendants will be referred to as "the Co–Defendants" throughout this opinion.

2. Specifically, Canney claims breaches of contract and of the covenant of good faith and fair dealing (Counts I and II), tortious misrepresentation (Count III), wrongful discharge (Count IV), retaliatory discharge (Count V), negligence (Count VI), malicious interference with contractual relations (Count VII), slander and libel (Counts VIII and IX), invasion of the right to privacy under Mass.Gen.L. ch. 214, § 1B (Count X), violation of the Massachusetts civil rights statute, Mass.Gen.L. ch. 12 § 11I, (Count XI), civil conspiracy (Count XII), and violations of 42 U.S.C. §§ 1983, 1985, and 1986 (Counts XIII through XVI). Counts I, II, and XVI are against Chelsea only. Counts IV and V are against Spence and Chelsea. The remaining counts are against certain of the Co–Defendants and Chelsea.

dire economic trouble. The city faced a projected structural deficit of $9,600,000.00, the tax base was virtually nonexistent, and state funding had been cut. *State Committee Urges Receivership for Chelsea, Mass.*, Wall St.J., August 29, 1991, at A4. Subsequently, the Massachusetts state legislature [3] declared that Chelsea was "unable to make annual contracts to provide essential services," "unable to collect property taxes," "unable to obtain reasonable access to credit markets," and concluded that a "fiscal crisis pose[d] an imminent danger to the safety of the citizens of [Chelsea]." 1991 Mass.Acts 200, § 1. On September 11, 1991, responding to a recommendation from the Governor, the legislature passed the Receivership Act, which was signed into law the next day. The Receivership Act authorized the Governor to appoint a receiver to an initial a one-year term, 1991 Mass.Acts 200, § 3(4), and provided, *inter alia*, that the receiver would be "the chief executive officer of the city ... responsible for the overall operation and administration of [Chelsea]." 1991 Mass.Acts 200, § 3(2).[4]

Canney's sixteen-count complaint is lengthy and detailed.[5] Distilled to their essence, the facts alleged are as follows: Early in 1992, after Chelsea had been placed in receivership, Chelsea advertised in local newspapers for the position of Director of Inspectional Services ("Director"). Complaint ¶ 16. Canney interviewed for this position and was ultimately hired in June, 1992. Complaint ¶¶ 17–22. At his final interview, Canney was told by Spence that if he was offered and accepted the position, Canney would be employed for the life of the Receivership ("three to four years") and that he would receive Civil Service protection for his position upon permanent hiring.[6] Although the previous Director was protected under state civil service laws, Canney was informed that his position was not similarly protected. Complaint ¶ 24. He was told earlier, however, that civil service protection would be provided for employees hired after the term of the receivership, when a new city charter was written. Complaint ¶ 20.

The three events which, Canney claims, ultimately led to his dismissal began approximately one year after his appointment. First, during September of 1993 Canney became concerned about various issues involving a Chelsea landlord. After a difference of opinion between Canney and the Co–Defendants regarding the illegality of the landlord's conduct, Canney alleges that he was told by Gladstone to adopt another inspector's report as his own. He declined to do so and that inspector's report was rescinded. Complaint ¶ 29(a). Second, in October of 1993, Canney believed that a prohibition on building parking facilities in Chelsea issued by Spence and Gladstone violated a local developer's due process rights. After expressing his concern to Spence and Gladstone, Canney claims his misgivings were "dismissed out of hand." Complaint ¶ 29(b). The next month, Canney and McGoldrick had a disagreement concerning the proper building permit requirements for City Hall reno-

---

3. For the sake of simplicity, the Massachusetts legislature, also known as the General Court, shall be referred to only as the legislature. All references to 'court' refer only to a judicial court.

4. Seven months after the imposition of receivership over Chelsea, the Supreme Judicial Court unanimously ruled that the legislature acted within its powers in passing the Receivership Act. *Powers v. Secretary of Administration*, 412 Mass. 119, 587 N.E.2d 744 (1992). Writing for the court, Chief Justice Liacos held that, as cities and towns are but legislatively created sub-divisions of the counties of the Commonwealth, the citizens of Chelsea did not have the right to a representative form of government for that city, and that the Receivership Act was a constitutional delegation of fundamental policymaking decisional powers by the state legislature to the executive branch. *Id.* at 128–31, 587 N.E.2d 744.

Chief Justice Liacos made it clear in his opinion that *Powers* was a limited holding, and left open for further review any challenges to the legality of the Receiver's actions under the Receivership Act. *Id.* at 128, 587 N.E.2d 744. This is such a case.

5. After reading Canney's 28 page, single-spaced complaint (replete with thirteen lengthy exhibits), this Court reminds Canney of Local Rule 5.1(a)(2) (requiring all documents, with the exception of discovery requests, filed in the District of Massachusetts to be typed double-spaced).

6. At the time of the interview, Spence was the Deputy Receiver for Chelsea. Complaint ¶ 20. In September, 1992, Spence was appointed as Chelsea's Receiver, replacing the individual originally appointed to fill that post. Complaint ¶ 25.

vations. Although Canney believed that the renovations were being undertaken contrary to the specifications, his suggestions were again "dismissed out of hand" by McGoldrick. Complaint ¶ 29(c).

Following these three events, Canney was summoned to Spence's office on December 3, 1993, and terminated. Complaint ¶ 30. Although Spence did not state a reason for his termination, Canney was told that Gladstone, the Deputy Receiver, did not believe that he had been "a team player." *Id.* Canney claims that he was discharged without "proper cause, notice, or hearing" in violation of statutory protections which were available to him under the Massachusetts Civil Service laws. Complaint ¶ 32. He also claims that during the period from November to December 1993, the Co–Defendants and their agents made various false and misleading statements to members of the public and the press concerning his performance. Complaint ¶ 33. As a consequence of Chelsea's and the Co–Defendants' actions, Canney contends that he sustained damages for which he seeks compensatory and punitive relief totalling $152,000,000.00. Canney also desires to be reimbursed for attorneys' fees and other costs associated with this suit.

### III. Standard of Review

 A motion to dismiss tests the legal sufficiency of the complaint, not the plaintiff's likelihood of ultimate success. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In assessing a motion to dismiss, the Court must take all allegations contained in the complaint as true and must draw all inferences in favor of the non-moving party. *Deren v. Digital Equip. Corp.,* 61 F.3d 1, 1 (1st Cir.1995); *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993); *Monahan v. Dorchester Counseling Center, Inc.,* 961 F.2d 987, 988 (1st Cir.1992). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (citations omitted).

 The crucial inquiry on a motion to dismiss is whether, based on the allegations of the complaint at issue, the plaintiff is entitled to offer evidence in support of his claims. *Siniscalchi v. Shop–Rite Supermarkets, Inc.,* 903 F.Supp. 182, 186 (D.Mass. 1995) (citing *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686). If the complaint is sufficient to state a cause of action in accordance with the law under any theory, the court must deny a motion to dismiss. *Wehringer v. Powers & Hall, P.C.,* 874 F.Supp. 425, 427 (D.Mass.1995) (quoting *Knight v. Mills,* 836 F.2d 659, 665 [1st Cir.1987]). Because of the various independent legal arguments addressed by Chelsea and the Co–Defendants, each party's motion will be treated separately in this discussion.

### IV. Analysis

#### A. Chelsea's Motion to Dismiss

The twelve counts of the complaint asserted against Chelsea can be grouped into two broad categories: common-law tort and contract claims arising out of Canney's termination (Counts I through VI and VIII through X), and state and federal civil rights and conspiracy claims (Counts XI, XII, and XVI). Each category will be examined *seriatim* below.

#### 1. Tort and Contract Claims

 This case presents the novel question whether a municipal receiver, who has been granted certain exclusive powers pursuant to an act of receivership passed by a state legislature, is an agent of the municipal government or of the Commonwealth for the purpose of determining which entity bears ultimate liability for the receiver's torts.

The crux of Chelsea's motion to dismiss the tort and contract claims revolves around Chelsea's assertion that the Co–Defendants were not its agents, servants, or employees at the time of their alleged tortious conduct. Memorandum of Law of Defendant, City of Chelsea, in Support of its Motion to Dismiss Plaintiff's Complaint ("Chelsea Memorandum") at 4. Instead, Chelsea contends that the named Co–Defendants were selected by the receiver and under his supervision, pursuant to the Receivership Act. In turn, the receiver was controlled by a state official, the Secretary of the Executive Office of Adminis-

tration and Finance ("Secretary"). The Commonwealth's ultimate power of control and authority over the receiver and his staff, Chelsea claims, absolves the city of any liability to Canney under a theory of agency or ratification for the conduct, employment decisions, and personnel changes made by Spence and his staff.

This Court agrees. Section 7 of the Receivership Act provides, in pertinent part:

> Notwithstanding the provisions of the charter or any city ordinance to the contrary, the receiver shall be the appointing authority and have supervision and control over all city employees and all personnel matters; the receiver shall hold all existing powers to hire and fire and set the terms and conditions of employment held by other employees or officers of the city, whether or not elected; ... no city employee or officer shall hire, fire, transfer or alter the compensation or benefits of any employee except with the written approval of the receiver. The receiver may delegate or otherwise assign these powers with the approval of the [S]ecretary.

1991 Mass. Acts 200, § 7. Likewise, section 8(2) of the Receivership Act grants the receiver the power to set the "compensation, terms, and conditions of employment" of his employees, subject "to the approval of the [S]ecretary." 1991 Mass. Acts 200, § 8(2). The last sentence of section 8(2) specifically states:

> All personnel hired under the authority of this paragraph, except such employees as the receiver formally designates independent contractors, shall be deemed employees of the Commonwealth....

1991 Mass. Acts 200, § 8(2).

According to the express language of these sections of the Receivership Act, it is clear that the Massachusetts legislature, in conferring various powers upon the receiver, granted him the power to hire and fire, made those hired by the receiver employees of the Commonwealth and, most importantly, vested a controlling interest in the receiver's decisions in the executive branch of the government of the Commonwealth by making his actions subject to "the approval of the

[S]ecretary." 1991 Mass. Acts 200, §§ 7, 8(2).

■ Exactly who, if anyone, had control over the receiver's actions is an issue crucial to this analysis, and an examination of common-law agency principles provides a suitable point of departure. The Restatement (Second) of Agency, portions of which have been incorporated into Massachusetts law, defines an agency relationship as having three essential characteristics: (1) the power of the agent to alter the legal relationships between the principal and third parties and the principal and himself; 2) the existence of a fiduciary relationship toward the principal with respect to matters within the scope of the agency; and 3) the right of the principal to control the agent's conduct with respect to matters within the scope of the agency. Restatement (Second) of Agency §§ 12–14 (1958) *cited in Sabel v. Mead Johnson & Co.,* 737 F.Supp. 135, 138 (D.Mass.1990). In examining agency relationships, courts have looked primarily at the third characteristic, the right to control the agent's conduct, to determine whether an agency relationship in fact exists. *Sabel,* 737 F.Supp. at 138 (citing *United States v. Paxson,* 861 F.2d 730, 734 [D.C.Cir.1988], and other cases).

In the present case, there has been no evidence proffered either in Canney's complaint or in pleadings submitted by any of the parties that Spence and his employees acted either specifically on Chelsea's behalf or at the behest of Chelsea's elected city officials. Furthermore, it is clear that control over the receiver's actions lay not in the hands of Chelsea, but in the hands of the Commonwealth. In fact, a close analysis of the Receivership Act indicates that the city receiver operated subject to the authority of the Secretary, who had "authority to reappoint the receiver for additional one-year terms ... [and who could] also terminate the receiver for cause at any time." 1991 Mass. Acts 200, § 3(5). In addition, the Receivership Act expressly mandated that the receiver be neither an elected nor an appointed official of Chelsea. *Id.* at § 3(3). The Receivership Act effectively eliminated the elected office of Mayor of Chelsea, and vested in the receiver all of the official acts and duties of that office,

with the proviso that all elected officials in the city government—except the former Mayor—would "serve in an advisory capacity" to the receiver. *Id.* at § 3(6). Section 7 gave the receiver the authority to appoint, supervise, and control existing city employees, as well as to hire, fire, and set the terms and conditions of employment for other elected or non-elected city officials. *Id.* at § 7. The Receiver's salary was determined by the Secretary and paid out of funds administered by the Commonwealth. *Id.* at § 3(7). Finally, the Receivership Act also granted the receiver immunity from civil liability arising from the exercise of his duties. *Id.* at § 3(8).

■ The law of receivership lends further support to the Court's conclusion that Chelsea did not have sufficient control over Spence's actions to create an agency relationship between the two. It is well established at common law that "a receiver is not the exclusive agent or representative of either party to the suit in which he is appointed...." 65 Am.Jur.2d *Receivers* § 138 (1972) (citation omitted). In fact, courts tend to impute an agency-type relationship between receivers and the courts which appointed them, although not explicitly labelling it as such. *See generally Id.* at § 136 ("A receiver is an officer, the creature, hand, or arm of, and a temporary occupant and caretaker of the property for, the court. He represents the court appointing him, and ... derives his authority from such court.") (citations omitted); *but see* 75 C.J.S. *Receivers* § 142 (1952) ("While the acts of a receiver are the acts of the court for which he acts, the relationship of principal and agent does not exist between them.") (citations omitted).

This basic principle—that appointing courts have a certain amount of control over receivers, whether referred to specifically as an agency relationship or not—has been restated by courts around the country. *See, e.g., Consolidated Rail Corp. v. Fore River Ry.,* 861 F.2d 322, 326–27 (1st Cir.1988)

("[T]he decision to appoint a receiver clearly lies within the discretion of the court.... [T]he appointment of a receiver brings all of the defendant's property under the exclusive control of the court and the receiver.") (citations omitted); *Ledbetter v. Farmer's Bank & Trust Co.,* 142 F.2d 147, 150 (4th Cir.) ("[A] receiver is the agent only of the court appointing him; he represents the court rather than the parties."), *cert. denied* 323 U.S. 719, 65 S.Ct. 48, 89 L.Ed. 578 (1944); *Federal Home Loan Mortgage Corp. v. Spark Tarrytown, Inc.,* 829 F.Supp. 82, 85 (S.D.N.Y.1993) ("A receiver acts 'as an officer of the court and has the duty to preserve and protect the property pending the outcome of the litigation. As a result, [the receiver's] authority is wholly determined by the order of the appointing court.'") (quoting *Citibank, N.A. v. Nyland [CF 8] Ltd.,* 839 F.2d 93, 98 [2d Cir.1988]); *Greenleaf Apartments, Ltd. v. Soltesz (In re Greenleaf Apartments, Ltd.),* 158 B.R. 456, 459 (Bankr.S.D.Ohio 1993) ("[A] receiver is a court appointed officer who is controlled exclusively by the court.... [H]e is not to be regarded as an agent or representative of either party to an action.") (citations omitted).

■ Massachusetts courts also appear to embrace the above-stated principle, holding generally that courts have the power to appoint a receiver, who is then subject to the court's control. *Spence v. Reeder,* 382 Mass. 398, 414–15, 416 N.E.2d 914 (1981) ("Once a court has taken the extraordinary step of creating a receivership ... that court surely must have and must utilize a continuing authority to issue supplementary orders designed to assist in various detailed aspects of the operation of the receivership.").[7]

■ Appointment of a receiver in any situation is an extraordinary remedy, one that ought be sparingly invoked. *See Lopez v. Medford Community Center, Inc.,* 384 Mass. 163, 169, 424 N.E.2d 229 (1981).

7. The plaintiff in the case cited above is the same Lewis H. Spence who is a Co–Defendant in this present case. At the time of the earlier suit, Spence was acting as the court-appointed receiver of the Boston Housing Authority, which had been placed in receivership in part to remedy the deplorable housing conditions affecting needy Boston residents. *See Perez v. Boston Housing Auth.,* 379 Mass. 703, 400 N.E.2d 1231 (1980) (*Perez II*); *Perez v. Boston Housing Auth.,* 368 Mass. 333, 331 N.E.2d 801, *appeal dismissed sub nom. Perez v. Bateman,* 423 U.S. 1009, 96 S.Ct. 440, 46 L.Ed.2d 381 (1975) (*Perez I*).

While Chelsea's receiver was appointed by the Governor rather than a court, Chelsea undoubtedly faced a truly exigent situation during the summer and fall of 1991 and the Supreme Judicial Court has upheld the constitutionality of the Receivership Act. *See Powers, supra* at note 4. This Court rules that the same agency exists between Spence and the Governor as between a court-appointed receiver and the court which appointed her.

Accordingly, this Court holds that Spence is an agent of the executive branch of the Massachusetts government, not the City of Chelsea, and Chelsea is not liable under a theory of agency nor under any derivative legal theory for Spence's allegedly tortious acts.[8] Counts I through VI and VIII through X of Canney's Complaint are therefore DISMISSED.

### *2. Federal and State Civil Rights Claims*

While Canney's civil rights claims against Chelsea are not dependant on the respondeat superior analysis employed above, they fair no better.

▮ In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities may be sued directly under 42 U.S.C. § 1983 for civil rights violations resulting from a governmental custom, policy, ordinance, regulation, or decision. *Id.* at 690–91, 98 S.Ct. at 2035–36. Following the Supreme Court's holding in *Monell,* courts within this Circuit have held that a plaintiff is required to plead and prove three elements in order to hold a city liable for § 1983 violations: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a right guaranteed her under the Constitution. *Holland v. Breen,* 623 F.Supp. 284, 290 (D.Mass.1985) (citing *Batista v. Rodriguez,* 702 F.2d 393,

397 [2nd Cir.1983] ). In addition, a plaintiff must plead the allegation of an official government policy or custom in her § 1983 complaint. *Scarpa v. Murphy,* 624 F.Supp. 33, 35 (D.Mass.1985) (dismissing plaintiff's § 1983 complaint for failure to allege the existence of a policy or custom against municipality).

Chelsea argues that *Monell* prevents Canney from obtaining relief since his complaint fails to allege that "his constitutional rights were denied by an official policy or custom of [Chelsea]." Chelsea Memorandum at 10. In response, Canney asserts that Chelsea did in fact adhere to specific policies and courses of action during his tenure. The specific "policies" were: (1) Spence's representation to Canney that he had an employment contract "for the life of the receivership"; (2) "a policy of removing certain employees despite and/or because of Civil Service protections available to them"; (3) "a policy of withholding from and/or actively misrepresenting to [Canney] (and others) that Civil Service protection was available to him and others"; (4) "a policy of terminating employees, such as Mr. Canney, despite previous representations and agreements and/or statutory protections to which they are due"; (5) "a policy of terminating [Canney] for exercising his constitutional rights of free speech and/or attempting to enforce the law and/or his concern for the rights of others"; and (6) "a policy of interfering with [Canney's] privacy and/or of causing his termination by false information." Plaintiff's Opposition to and Memorandum of Law in Opposition to Defendants' Motions to Dismiss Plaintiff's Complaint ("Plaintiff's Opposition") at 10–15.

What Canney refers to as "policies" of Chelsea, however, appear to be nothing more than facts unique to the saga of his case. The Oxford English Dictionary defines "policy" as "[a] course of action adopted and

---

**8.** Given the Court's conclusion that Spence and Chelsea did not share a principal-agent relationship, Canney's alternative claim that Chelsea is liable under a theory of ratification since it "[chose] to do nothing to rectify any of the wrongs done to Canney," Complaint ¶¶ 51, 57, 62, 80, 85, and 90, is without merit. It is impossible to argue that Chelsea—acting as a purported principal where it had neither the statutory nor administrative authority to do so—could have rectified or ratified Spence's conduct, since a purported or intended principal cannot ratify an act which the principal could not have authorized in the first place. *See* Restatement (Second) of Agency § 84(2) (1957); *see also Reeve v. Folly Hill Ltd. Partnership,* 36 Mass.App.Ct. 90, 94, 628 N.E.2d 36 (1994) (adopting section 84[2] ).

pursued by a government, party, ruler...." VII Oxford Dictionary 1071 (1933), *cited in Pembaur v. Cincinnati,* 475 U.S. 469, 481 n. 9, 106 S.Ct. 1292, 1299 n. 9, 89 L.Ed.2d 452 (1986). For example, all Canney offers as evidence of Chelsea's "policy" of removing certain employees "despite and/or because" of their having Civil Service protection is an innocuous statement made by McGoldrick about the Civil Service status of individuals who were disfavored by certain of the Co–Defendants. Plaintiff's Opposition at 11. One isolated incident, without demonstrating something more—perhaps a pattern of activity repeated over time, or conduct reflective of an official pronouncement—does not, according to the dictionary definition cited with approval by the Supreme Court, a policy make.

The Supreme Court has attempted. precisely to define when a decision on a single occasion may be enough to establish an unconstitutional municipal policy in violation of § 1983. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).[9] While the *Monell* court pointed out that local governments could be held liable under § 1983 only where an injury was inflicted by a government's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy," *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38, the Supreme Court in *Praprotnik* specifically held that the identification of policymaking officials is a question of state law, rather than a question of fact for the jury. *Praprotnik,* 485 U.S. at 124, 108 S.Ct. at 924–25. The plaintiff in *Praprotnik,* a management-level employee in a city agency for twelve years, successfully appealed a temporary suspension to the local

civil service commission. After his transfer to another city agency and a second appeal which was declined without hearing by the civil service commission,[10] he was laid off the next year. The plaintiff subsequently brought suit against the city claiming that he had been retaliated against by his supervisors for exercising his First Amendment rights after his initial suspension. *Id.* at 115–16, 108 S.Ct. at 919–20. In reversing the Eighth Circuit Court of Appeals, the Supreme Court looked to the city charter and determined that although the city's mayor and aldermen had the authority to set employment policy for the city, the city's civil . service commission had the *final* authority to interpret and enforce personnel actions. *Id.* at 128–29, 108 S.Ct. at 926–27. The Court reasoned that even if the plaintiff had successfully alleged a scheme by his supervisors, in existence for over a year, that culminated in his layoff, "it says nothing about the actions of those whom the law established as the makers of municipal policy in matters of personnel administration," *i.e.,* the mayor and aldermen. *Id.* at 128, 108 S.Ct. at 927. Finding no evidence of an unconstitutional policy promulgated by the city's elected officials empowered with setting up policy, the Supreme Court held that the city could not be held liable for a section 1983 violation. *Id.*[11]

■ Here, the Receivership Act indicates that the receiver was the ultimate municipal authority in Chelsea. 1991 Mass. Acts 200, § 3(6). The Receivership Act required Chelsea's elected officials to "serve in an advisory capacity" to the receiver. *Id.* Assuming *arguendo* that all of Canney's allegations

---

**9.** The Supreme Court in *Pembaur* first articulated four guiding principles establishing when a municipality may be exposed to liability under § 1983: liability could attach (1) for acts which the municipality itself is actually responsible; (2) for acts ordered by officials who have "final policymaking authority;" (3) the existence of such authority being a question of state law; and (4) for acts taken pursuant to a policy adopted by officials responsible under state law for making policy in *that area* of the city's business. *Pembaur,* 475 U.S. at 480–83, 106 S.Ct. at 1298–1300, *cited in Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924 (emphasis in original). The *Praprotnik* court noted that the *Pembaur* standard created confusion among various Courts of Appeal, thus lead-

ing to the Supreme Court's clarifying opinion. *Praprotnik,* 485 U.S. at 123–24, 108 S.Ct. at 924–25.

**10.** The civil service commission apparently declined to hear the appeal because the plaintiff had not suffered a reduction in pay or grade. *Id.* at 116, 108 S.Ct. at 919–20.

**11.** The court also noted with interest that the plaintiff never attempted to prove that the retaliation to which plaintiff was subjected was ever directed at anyone other than himself. *Id.* at 128, 108 S.Ct. at 927.

against Spence and the other Co–Defendants are true, Canney has failed to show that there was a policy or custom that originated with municipal officials from Chelsea, a failure which is fatal to his cause of action. Even if Chelsea municipal officials were shown to have been a part of the alleged retaliation against Canney, it appears that they would have been powerless to act, since their authority to do so had been taken by the legislature and delegated to Spence through the Receivership Act. Thus, Canney is unable to state an actionable section 1983 claim against Chelsea as matter of law.[12]

■ Massachusetts state courts have not yet decided whether the official policy or custom standard established in *Monell* applies to claims submitted under the Massachusetts Civil Rights Act (the "Civil Rights Act"), Mass.Gen.L. ch. 12 §§ 11H, 11I. *See Broderick v. Roache,* 803 F.Supp. 480, 485 n. 4 (D.Mass.1992) (citing *Rodriques v. Furtado,* 410 Mass. 878 n. 14, 575 N.E.2d 1124 [1991] ). The Supreme Judicial Court has stated, however, that the Civil Rights Act and Section 1983 are parallel statutes, coextensive with each other. *See id.* (citing *Batchelder v. Allied Stores Corp.,* 393 Mass. 819, 822–23, 473 N.E.2d 1128 [1985] ). One crucial difference between the state civil rights statute and its federal counterpart is that § 11I of the Civil Rights Act "creates a cause of action against those who, 'by threats, intimidation or coercion' interfere[ ] with another's exercise or enjoyment of" constitutional rights. *Britton v. Maloney,* 901 F.Supp. 444, 453 (D.Mass.1995) (quoting *Lyons v. National Car Rental Systems, Inc.,* 30 F.3d 240, 245–46 [1st Cir.1994] ). The Supreme Judicial Court has likewise held that "the 'essential element' of a [Civil Rights Act] violation is threat, intimidation, or coercion." *Layne v. Superintendent, Massachusetts Correctional Institution,* 406 Mass. 156, 158, 546 N.E.2d 166 (1989), cited in *Broderick,* 803 F.Supp. at 486. Canney has made

no claim of threat, intimidation, or coercion against him sufficient to sustain a cause of action against Chelsea to satisfy the Massachusetts Civil Rights Act. As matter of law this claim must also fail.

■ Finally, Chelsea alleges that Canney fails to state actionable claims under either 42 U.S.C. §§ 1985 or 1986 since section 1985 was originally designed to furnish relief for interference with a plaintiff's rights where the interference was based on racial or class-based invidious discrimination claims, and section 1986 is derivative of section 1985. *See Briley v. California,* 564 F.2d 849, 858–59 (9th Cir.1977) (cited in *Thompson v. Sanborn,* 568 F.Supp. 385, 387–88 [C.D.N.H.1983] ). To state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege a conspiracy motivated by a racial or otherwise class-based invidiously discriminatory animus. *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Canney states that Spence and the Co–Defendants engaged in a conspiracy motivated by a class-based, invidiously discriminatory animus in seeking to prevent Canney and others from exercising their rights under the Civil Service statute. There is nothing in the Complaint, however, to suggest that the Co–Defendants treated Canney and others as a class—indeed Canney makes reference to no person other than himself in his complaint. Similarly, Canney provides no evidence that his termination was motivated by a discriminatory intent. With respect to the section 1986 claim, a complaint filed under section 1986 must establish a violation of section 1985, and claims which fail to do so must be dismissed. *Condosta v. Vermont Elec. Co-op., Inc.,* 400 F.Supp. 358 (D.Vt. 1975). Since there has not been a violation of section 1985, there can be no violation of section 1986, and Canney's claims must be dismissed.

Because Chelsea has shown that, even if all of Canney's factual allegations are true,

---

12. Having concluded that there is no evidence of a policy or custom that can be asserted against Chelsea, it is unnecessary to examine here the issue of causation or whether Canney was deprived of a constitutional right under the § 1983 three-part analytical framework identified by this

Court in *Holland v. Breen, supra.* Analysis of a possible deprivation of Canney's constitutional rights, however, is appropriate with respect to the § 1983 claims against the Co–Defendants. For such an analysis, see *infra* parts IV.B.1, 3.

there is no entitlement to relief for the federal and state civil rights claims as matter of law, its Motion to Dismiss, therefore, must be GRANTED in its entirety.

### B. Co–Defendants' Motion to Dismiss

#### 1. Federal and State Claims Against Co–Defendants in Their Official Capacities

The Co–Defendants first argue that all claims against them in their official capacities should be dismissed under 42 U.S.C. § 1983 and the Eleventh Amendment. Since (1) a suit against an official in his or her official capacity is treated as a suit against the state, *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985), (2) the Eleventh Amendment acts as a bar against suits filed in federal court against a state, its subdivisions, or its officials, *Edelman v. Jordan,* 415 U.S. 651, 662, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) and, (3) there is no evidence that the Commonwealth has waived its immunity to suit; Co–Defendants argue that there is no basis for a section 1983 damages action against them. In the alternative, Spence, Gladstone, and McGoldrick argue that they acted as employees of the Commonwealth within the scope of their employment under Section 8(2) of the Receivership Act, thus precluding a suit against them in their official capacities.

Resolution of this issue depends upon whether the Co–Defendants are to be considered state employees or municipal employees for the purposes of section 1983. Here, Co–Defendants Gladstone and McGoldrick were on the receiver's staff and were compensated with monies from the state treasury. Spence, the official who appointed them, was himself appointed by the Governor, and had to report to the Secretary of Administration and Finance for the Commonwealth. The Secretary ultimately had termination authority over Spence's receivership.

 Having earlier concluded that the Co–Defendants are not agents or employees of Chelsea, the Court holds that Spence, and by derivation the other Co–Defendants, are protected as public officials under the language of the Receivership Act and Massachusetts decisional law concerning the personal liability of a receiver for actions performed within the scope of the receivership. First, section 3(8) of the Receivership Act states that "[t]he receiver shall be immune from civil liability arising from the exercise of his duties." 1991 Mass. Acts 200, § 3(8). This Court has already determined that Spence had the authority to hire and fire city employees, and there is no need to revisit the issue here. Second, Massachusetts cases have adopted the well-established precept from the law of receivership that "actions against receivers growing out of the performance by them of their duties within the scope of their powers under the valid orders of the court appointing them do not bind them personally." *Wood v. Comins,* 303 Mass. 367, 369, 21 N.E.2d 977 (1939). *See also Federal Home Loan Mortgage Corp. v. Tsinos,* 854 F.Supp. 113, 116 (E.D.N.Y.1994); *Rosso v. Freeman,* 30 F.2d 826, 828 (D.Mass. 1929). Here, although Spence and his staff were acting according to authority conferred upon them by the state legislature rather than a court, they are similarly immune from personal liability for their actions. Since Canney is not attacking the validity of the Receivership Act but the validity of Spence's actions in terminating him, this Court rules that Spence is immune from suit for the exercise of duties properly conferred upon him by the Receivership Act. The federal and state law counts against Spence in his official capacity are thus DISMISSED.

 The state law counts against Spence's Co–Defendants in their official capacities are also dismissed under similar reasoning, since Gladstone and McGoldrick are state employees appointed by Spence. Under the provisions of Mass.Gen.L. ch. 258 § 2, a public employee shall not be found liable for a negligent or wrongful act if the employee was acting within the scope of the employment and the employee was under the direction and control of the public employer. *Doe v. Town of Blandford,* 402 Mass. 831, 835, 525 N.E.2d 403 (1988); *Smith v. Steinberg,* 395 Mass. 666, 669, 481 N.E.2d 1344 (1985). Gladstone and McGoldrick were so employed and their actions met the requirements of the statute, so liability cannot at-

tach to them. The negligence and wrongful termination claims (Counts III through VI) are thus DISMISSED.

In addition, Count VII warrants dismissal because, as matter of law, an employer cannot be held liable for interference with advantageous relations "in its own affairs any more than an employer is liable for tortious interference between itself and an employee." *Saint Louis v. Baystate Medical Center, Inc.*, 30 Mass.App.Ct. 393, 404, 568 N.E.2d 1181 (1991) (citations omitted).

### 2. State Law Claims Against Co–Defendants in Their Personal Capacities

The remaining state law claims [13] are dismissed for failure to state a claim as matter of state law. Procedurally, the slander and libel claims (Counts VIII and IX) are meritless because Canney's complaint does not give evidence of any specific oral statements as made by the Co–Defendants which would give rise to slander or any newspaper articles (although two articles are referred to) which could be considered libelous. Above and beyond Canney's neglect of basic pleading requirements, the slander and libel claims must also fail as matter of substantive law. In a defamation action, a threshold issue is whether the statement described is reasonably susceptible of defamatory meaning, which is a question of law for the court to decide and involves examining the statement in its totality and in the context in which it was published. *Foley v. Lowell Sun Pub. Co.*, 404 Mass. 9, 11, 533 N.E.2d 196 (1989). Here, Spence's observation that Canney "brought integrity" to the inspectional services department even though he was leaving is not the type of statement that can be considered defamatory by any "respectable class of the community." *Milgroom v. News Group Boston, Inc.*, 412 Mass. 9, 12, 586 N.E.2d 985 (1992) (cited in *Brown v. Hearst Corp.*, 862 F.Supp. 622, 627 [D.Mass. 1994], aff'd by 54 F.3d 21 [1st Cir.1995]). Accordingly, Counts VIII and IX must be DISMISSED.

The invasion of privacy claim (Count X) fails to allege the "unreasonable, substantial, or serious interference with" Canney's privacy as required by Mass.Gen.L. ch. 214 § 1B. In particular, there is no evidence of any private facts, if any, that were disclosed about him by any of the defendants. In addition, "false light privacy" is not recognized in Massachusetts. *ELM Medical Laboratory, Inc. v. RKO General, Inc.*, 403 Mass. 779, 787, 532 N.E.2d 675 (1989). Therefore, Count X must be DISMISSED.

The civil rights claim against the Co-defendants as individuals (Count XI) is faulty since the mere statement of a claim under the federal civil rights statute does not automatically result in a valid claim arising under Mass.Gen.L. ch. 12, § 11I unless the plaintiff "alleges a deprivation of ... rights by threats, intimidation, or coercion." *Curran v. City of Boston*, 777 F.Supp. 116, 122 (D.Mass.1991) (citations omitted). Here, Canney fails to allege the necessary "threats, intimidation, or coercion" required to state a claim, and mere recitals of boilerplate claims of "threats, intimidation, or coercion" do not meet the requirements of Massachusetts civil rights pleading according to *Hobson v. McLean Hospital Corp.*, 402 Mass. 413, 417, 522 N.E.2d 975 (1988). Count XI must therefore be DISMISSED.

The civil conspiracy claim (Count XII) must be DISMISSED on these grounds.

### 3. Federal Law Claims Against Co–Defendants in Their Individual Capacities

The counts against the Co–Defendants in their personal capacities, however, must remain. The Co–Defendants allege that the section 1983 claims must be dismissed for failure to establish any deprivation of a constitutionally protected right. Canney claims that he has set forth three different bases for a section 1983 cause of action, namely (1) exercise of a fundamental right, (2) substantive due process, and (3) procedural due process. *See Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 983,

---

**13.** Counts VIII (slander), IX (libel), X (invasion of privacy), XI (violation of civil rights), and XII (civil conspiracy).

108 L.Ed.2d 100 (1990). This Court is persuaded that Canney has alleged facts sufficient to establish a violation of either the First Amendment right to freedom of speech (if the trier of fact believes Canney's allegations concerning the three incidents that immediately preceded his dismissal), the right to substantive due process (if Spence's representation to Canney that Canney was being given a "permanent replacement position for the life of the receivership" is true), the right to procedural due process (if Canney did have a property interest in his employment, was in fact protected under state civil service laws, and was in fact deprived of his position without constitutionally sufficient process). Given that these allegations are pleaded with sufficient particularity in the complaint, dismissal of the section 1983 claims against the Co–Defendants in their personal capacities is not appropriate in this instance.

The section 1985 and section 1986 claims are another story. Echoing the protests raised by Chelsea, the Co–Defendants argue that Canney's claims under 42 U.S.C. §§ 1985 and 1986 should be dismissed for failure to allege any discriminatory animus. This argument has been canvassed *supra* and the counts against the Co–Defendants should be dismissed for the same reasons.

### V. Conclusion

For the foregoing reasons, Chelsea's Motion to Dismiss is **GRANTED** in its entirety. The Co–Defendants' Motion to Dismiss is **GRANTED** in part and **DENIED** in part as detailed above.

SO ORDERED.