USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1555

 DM RESEARCH, INC., ETC.,

 Plaintiff, Appellant,

 v.

 COLLEGE OF AMERICAN PATHOLOGISTS
 and NATIONAL COMMITTEE FOR CLINICAL LABORATORY STANDARDS,

 Defendants, Appellees.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ernest C. Torres, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
Gibson, Senior Circuit Judge,
and Lynch, Circuit Judge.

 Evan Slavitt with whom Andrew A. Honegger and Gadsby & Hannah 
LLP were on brief for appellant.
 Jack R. Bierig with whom Virginia A. Seitz, Sidley & Austin,
Richard A. Licht, Steven M. Richard and Tillinghast, Licht &
Semonoff were on brief for appellees.

March 4, 1999

 BOUDIN, Circuit Judge. DM Research, Inc., the plaintiff
in the district court, is a Rhode Island company that for many
years has been engaged in the production of reagents, which are
substances used in the testing or synthesis of other products. The
defendants in the district court were two organizations: the
College of American Pathologists ("the College"), a non-profit
Illinois corporation comprising several hundred pathologists, and
the National Committee for Clinical Laboratory Standards
("National"), a nonprofit Pennsylvania corporation representing a
variety of manufacturing, testing, and other interests.
 Since the case was resolved below on a motion to dismiss,
we take the factual allegations of the complaint as true. SeeWatterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). Among other
products DM Research makes is what its complaint calls "reagent
grade water," a form of purified water used in clinical
laboratories for various purposes. National's main role is to
develop uniform standards relating to clinical laboratory testing;
its standards, like those of most private standard-setting
organizations, have no legal force but may be followed voluntarily
or used in certification arrangements.
 In 1991, National adopted a guideline document titled
"Preparation and Testing of Reagent Water in the Clinical
Laboratory, Approved Guideline" (2d ed. Aug. 1991). The guidelines
set down minimum requirements reagent water should meet, e.g., as
to bacterial content, pH, resistance to electrical transmission,
silicate content, particulate content, and organic content. 
According to the complaint, one of the guidelines effectively
requires complying laboratories--at least for certain procedures--
to use reagent water produced using a purification system on site,
rather than using bottled reagent water manufactured elsewhere. 
National's guidelines require just-produced water for certain
laboratory tests on the ground that the resistivity of the water
tends to degrade rapidly over time.
 Equipment, apparently costing $1,000 or more, is
available for on-site production of reagent water. Laboratories
that choose to comply with the National guideline at issue now
purchase such equipment instead of buying reagent water from DM
Research or its competitors. In DM Research's view, National's
requirement of on-site production is scientifically unjustified. 
The details of this scientific quarrel are not important for
present purposes; we assume arguendo that DM Research could prove
at trial that National's guideline is unnecessary.
 Although the National reagent water guidelines have no
legal force, the College has incorporated them into its own
guidelines, which it uses in accrediting laboratories, including
hospital laboratories. According to the DM Research complaint, the
loss of such accreditation would, as a practical matter, be
"devastating" to a laboratory. And while the complaint is quite
obscure on this point, we will assume that DM Research could prove
at trial that many of DM Research's potential customers have strong
practical reasons for complying with the College's guidelines even
though they may have no legal obligation to do so. 
 The complaint alleges that the effect of the National
guidelines and their adoption by the College was to limit the
growth in DM Research's sales of its reagent water and ultimately
to force the owner of DM Research to sell the company at reduced
price. The complaint charged, inter alia, that National and the
College had conspired to restrain trade in the provision of high
grade reagent water products, including bottled reagent water and
water purification equipment, thereby violating section 1 of the
Sherman Act, 15 U.S.C. 1.
 The complaint says that the provision of such products to
laboratories constitutes a national "market," within the meaning of
the antitrust laws, and solely for purposes of our decision we will
assume this to be so. It also says that the acts in furtherance of
the conspiracy were as follows:
 (a) the creation, adoption, and enforcement of 
 faulty and arbitrary standards and guidelines
 and (b) economic threats and intimidation of
 certain laboratories and referring
 pathologists to cease or refrain from doing
 business with DM Research and other bottled
 reagent water manufacturers.

What weight is to be given to allegations of this character, and to
the general charge of "conspiracy," is the central issue in this
case.
 The College moved to dismiss, Fed. R. Civ. P. 12(b)(6),
on the ground that the complaint failed to state a claim under the
Sherman Act; National moved to dismiss for this reason and for 
lack of personal jurisdiction and venue. DM filed an opposition
but no affidavits. In a thoughtful memorandum and order, dated
April 14, 1998, the district judge granted the motion to dismiss
the Sherman Act count for failure to state a claim and, declining
to exercise supplemental jurisdiction, see 28 U.S.C. 1367,
dismissed without prejudice the remaining state law claims (state
antitrust, tortious interference, and defamation). See DM
Research, Inc. v. College of American Pathologists, 2 F. Supp. 2d
226 (D.R.I. 1998).
 On DM Research's appeal, our review of the district
court's decision is de novo. See Preferred Mutual Ins. Co. v.
Travelers Cos., 127 F.3d 136, 137 (1st Cir. 1997). The issue is
whether the complaint states a claim under the Sherman Act,
assuming the factual allegations to be true and indulging to a
reasonable degree a plaintiff who has not yet had an opportunity to
conduct discovery. See Watterson, 987 F.2d at 3. The issue turns
as much on a recurring problem of civil procedure--what force is to
be accorded conclusory terms in a complaint--as it does on
antitrust analysis.
 The governing precept, to borrow the district court's
excellent summary, is that while the plaintiff's "facts" must be
accepted as alleged, this does not automatically extend to "[b]ald
assertions, subjective characterizations and legal conclusions," 
2 F. Supp. 2d at 228 (citing cases); further, as the district judge
said, "the factual allegations must be specific enough to justify
'drag[ging] a defendant past the pleading threshold,'" id. at 228
(quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir.
1988)).
 Gooley's concept of "the pleading threshold" is critical.
The complaint should include "a short and plain statement" of the
claim showing that the pleader is entitled to relief, Fed. R. Civ.
P. 8(a), so it need not include evidentiary detail. On the other
hand, the price of entry, even to discovery, is for the plaintiff
to allege a factual predicate concrete enough to warrant further
proceedings, which may be costly and burdensome. Conclusory
allegations in a complaint, if they stand alone, are a danger sign
that the plaintiff is engaged in a fishing expedition. 
 In framing its Sherman Act claim, DM Research chose to
treat National and the College as independent actors who
"conspired" with each other to adopt and implement a scientifically
unjustified restriction that foreclosed to DM Research a
substantial body of customers. Conspiracy in antitrust parlance is
pretty much a synonym for agreement, see, e.g., Copperweld Corp. v.
Independence Tube Corp., 467 U.S. 752, 757 (1984), and almost any
agreement between independent actors that restrains competition is
potentially subject to examination for "reasonableness" under
section 1, see National Soc'y of Professional Eng's v. United
States, 435 U.S. 679, 686-91 (1978). There are exceptions, see,
e.g., NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982); Eastern
R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S.
127 (1961), but none is apt here.
 Whether an agreement is "unreasonable" from an antitrust
standpoint is a complicated matter--much of antitrust law is
devoted to it--apart from a few agreements regarded as "per se"
unlawful (such as price-fixing agreements between competitors). 
See U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 593
(1st Cir. 1993). Let us suppose National and the College could not
lawfully "agree" on the adoption of a faulty standard that excluded
DM Research from access to important customers. Literally read,
the complaint does allege such a conspiracy, albeit in conclusory
terms.
 But no antitrust lawyer could help but ask almost
immediately why National and the College would conspire. It is
easy enough to understand why two manufacturers might agree to
charge above-market prices; if taken together they have market
power, the agreement can increase their profits. See United Statesv. Socony-Vacuum Oil Co., 310 U.S. 150 (1940). The complaint here
does allege that some National members make or are otherwise
interested in the manufacture of water purification equipment. 
But, without more detail, it is highly implausible to suppose that
the College or its members have any reason to "agree" with National
to adopt a faulty standard whose main effect would be to raise
costs for laboratories that found it cheaper to buy bottled
reagent water than to make it on site.
 DM Research asserts that the district court was required
to accept, for purposes of the motion to dismiss, that such a
conspiracy existed, however implausible it might be. But terms
like "conspiracy," or even "agreement," are border-line: they
might well be sufficient in conjunction with a more specific
allegation--for example, identifying a written agreement or even a
basis for inferring a tacit agreement, cf. Interstate Circuit v.
United States, 306 U.S. 208, 221-25 (1939)--but a court is not
required to accept such terms as a sufficient basis for a
complaint. The case law on this point is ample.
 This is no technical mouse-trap for an unduly terse 
plaintiff. Litigation, even at the pleading stage, is an on-going
process. Once DM Research knew the thrust of the defendants'
arguments for dismissal, it was perfectly free to respond to the
motion to dismiss by providing the district court with additional
facts to make its complaint concrete and plausible. If DM Research
had responded with an amendment to the complaint or even with an
affidavit setting forth such detail, the district court certainly
would not have dismissed the case out of hand. Yet nothing in DM
Research's opposition, or even its brief on appeal, adds anything
factual to underpin its complaint.
 Occasionally, an implausible conclusory assertion may
turn out to be true. Perhaps for some unknown reason National and
the College collaborated in adopting a faulty standard. But the
discovery process is not available where, at the complaint stage,
a plaintiff has nothing more than unlikely speculations. While
this may mean that a civil plaintiff must do more detective work in
advance, the reason is to protect society from the costs of highly
unpromising litigation.
 DM Research's brief bears out the district court's
concerns. It speculates that excluding DM Research might lower the
price of purification equipment for reagent water. In fact,
excluding competitors of good substitute products (here, bottled
reagent water) almost always tends to stabilize or raise the price
of substitutes. DM Research says that the health care industry is
a "counter-intuitive" world of its own, "[h]ighly regulated and
idiosyncratic," but DM Research does not explain how this makes its
conspiracy more plausible. And it asserts, unhelpfully, that
"[o]ther [College] and [National] members may benefit for other,
yet unknown reasons."
 DM Research points out that individuals or companies
sometimes do act contrary to their own interest. No doubt this is
true and, if DM Research had alleged facts indicating an agreement-
-instead of merely asserting a conspiracy in conclusory terms--
improbability would not normally warrant dismissal for failure to
state a claim (there may be extreme exceptions). But improbability
is ample reason for the court to demand something more than mere
conclusions as to conspiracy, which is all that DM Research has
offered here.
 What we have said thus far, very much echoing the
district court, disposes of the Sherman Act claim as it has been
framed by DM Research itself. But the complaint also charged that
the guidelines are scientifically unsupported and adversely
affected DM Research's ability to sell high grade reagent water. 
Even if the defendants did not conspire, are these allegations not
enough to frame a complaint against each of the defendants
separately? If so, we might be more hesitant to affirm the
dismissal merely because the theory was imperfectly expressed, cf.Vartanian v. Monsanto Co., 14 F.3d 697, 702 (1st Cir. 1994), even
though the argument might technically be forfeited on appeal, seeNichols v. Cadle Co., 139 F.3d 59, 64 (1st Cir. 1998).
 At first blush, separate claims against National or the
College might appear to be foreclosed because each is a
corporation, and under Copperwald Corp. v. Independence Tube Corp.,
467 U.S. 752 (1984), a corporation--although it may comprise and
act through individual employees or wholly owned subsidiaries--is
not deemed able to "conspire" with itself. See id. at 767-69. 
This is so not a priori, but for policy reasons; and the policy
reasons may not apply with the same force, in all circumstances, to
a trade or professional association.
 After all, such organizations may, in at least some of
their functions, operate essentially as a means of coordinating the
actions of their independent members; and in some cases their
actions have been viewed as the joint actions of the members. 
There are so many variables that no single generalization is
secure. We are therefore going to assume arguendo that the actions
of National or the College, taken separately from each other, could
in the present circumstances be regarded as the product of an
agreement of members of each organization operating within the
framework of the single organization.
 Nevertheless, it is commonplace, and often very useful,
for organizations to recommend quality standards (like National) or
adopt them as part of a certification process (like the College). 
Merely to say that the standards are disputable or have some market
effects has not generally been enough to condemn them as
"unreasonable" under the Sherman Act. A few cases say this
explicitly, see, e.g., Consolidated Metal Products, Inc. v.
American Petroleum Inst., 846 F.2d 284, 294 (5th Cir. 1988), but
more important, something else or more extreme is generally present
in the cases that have condemned quality standards as
anticompetitive.
 In such cases, the principal concern has been the use of
standards setting as a predatory device by some competitors to
injure others; normally there is a showing that the standard was
deliberately distorted by competitors of the injured party,
sometimes through lies, bribes, or other improper forms of
influence, in addition to a further showing of market foreclosure. 
See Hovenkamp, Economics and Federal Antitrust Law 10.3, at 286
(1985). Without some kind of protective screen for treble damage
liability, there would be few standards set since most involve
disputable judgment calls.
 In this case, there is no claim that the College's
members compete with DM Research or at all. In the case of
National, the complaint does allege that two members somehow
involved in the writing of the guidelines were connected with
purification equipment and that other unspecified members of
National have similar interests; but it does not say that such
members dominated the decision making, or bribed or lied to other
members. See Eliason Corp. v. National Sanitation Foundation, 614
F.2d 126 (6th Cir.), cert. denied, 449 U.S. 89 (1980).
 The only complaint paragraph (quoted above) that comes
close to alleging improper conduct says that "the conspiracy"
involved "economic threats and intimidation" of certain
laboratories and caused pathologists to cease or refrain from using
bottled reagent water. Once again, the phrasing is general and
there are no specifics. See Canney v. City of Chelsea, 925 F.
Supp. 58, 70 (D. Mass. 1996). Still, this claim may be more
plausible if read--as its phrasing suggests--as directed not to
National's framing of the standard but to its "enforcement" by the
College as a requirement for membership or certification.
 If the College says to a laboratory or a pathologist that
membership or its certification depends on respect for the
guidelines, that may well constitute an economic threat from the
standpoint of the laboratory or pathologist who finds it cheaper
to buy bottled water. But it is not intrinsically an antitrust
violation for an organization to limit its endorsement to those who
meet its published standards unless the standard itself is shown to
be anticompetive in purpose or effect. See Greater Rockford Energy
Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 396 (7th Cir.), cert.
denied, 510 U.S. 1111 (1994). And such a showing, even to the
modest extent required in a complaint, requires more than epithets.
 Affirmed.